| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK**<br>------------------------------------------------------------x<br>**In re:**              )<br>                            )<br>**TAVERN ON THE GREEN**      )<br>**LIMITED PARTNERSHIP, et al.,**  )<br>                            )<br>                  **Debtors.**   )<br>                            )<br>------------------------------------------------------------x | **NOT FOR PUBLICATION**<br><br>**Chapter 11**<br><br>**Case No. 09-15450 (ALG)**<br>**Case No. 09-15448 (ALG)**<br><br>**(Jointly Administered)** |

A P P E A R A N C E S:

AKERMAN SENTERFITT LLP
Counsel for the Debtors
   By:   Keith N. Costa, Esq.
         Susan Balaschak, Esq.
         Martin Domb, Esq.
         Kathlyn Schwartz, Esq.
335 Madison Avenue, Suite 2600
New York, New York 10017

DUVAL & STACHENFELD LLP
Counsel for the Official Committee of Unsecured Creditors
   By:   Norman N. Kinel, Esq.
101 Park Avenue, 11th Floor
New York, New York 10178

MICHAEL A. CARDOZO, ESQ.
Corporation Counsel of the City of New York
Counsel for the City of New York
   By:   Gabriela P. Cacuci, Esq.
100 Church Street, Room 5-223
New York, New York 10007


**MEMORANDUM OF OPINION AND ORDER**

Tavern on the Green Limited Partnership ("TOTG") and its immediate parent

corporation, LeRoy Adventures, Inc. (together with TOTG, the "Debtors"), filed for relief

under Chapter 11 of the U.S. Bankruptcy Code on September 9, 2009. The filings

followed a decision by the New York City Department of Parks (the "City") not to enter

1

into a new license agreement for the operation by TOTG of a well-known restaurant of the same name located in Central Park in Manhattan.

During the course of the bankruptcy proceedings the Debtors and the City have, with some difficulty, managed to agree on aspects of the transition. They have agreed on the date for termination of operations and turnover of the premises. They have agreed to the procedures for an auction sale of the Debtors' property located on the premises. They have also agreed on two schedules of property, one entitled Parks Department Inventory ("City Inventory") and one entitled Tavern on the Green Inventory ("TOTG Inventory"). (See Ex. B attached to the City's Objection to the Debtors' Motion to Approve Auction Sale). The items on the City Inventory will presumably be left behind when TOTG vacates the premises; the items on the TOTG Inventory will be auctioned off.

The parties have not agreed on the Debtors' right to auction a relatively limited number of items, originally listed on Ex. C to the City's Objection (the "Disputed Items"). The three principal items in dispute are item 4 (a mural on canvas attached to the walls of the so-called Park Room); items 6 and 12 (chestnut paneling in and around the Chestnut Room); and item 13 (certain decorative figures on the plaster ceiling in the Crystal and Terrace Rooms). The remaining items in dispute include six banquettes; lighting fixtures such as stage lighting, light posts for dance floors and disco lighting; and the frame for the canopy outside the restaurant.[1]

---

[1] The following items from Ex. C to the City's Objection were partially or fully resolved by the parties prior to or at the hearing:
- Item 1 – revolving coat check system (resolved in favor of the Debtors at the hearing);
- Item 2 – copper signs (resolved in favor of the Debtors prior to the hearing);
- Item 7 – stained glass "Private Dining" sign (resolved in favor of the Debtors prior to the hearing);
- Item 11 – two small robo coupes (resolved in favor of the Debtors at the hearing);
- Item 14 – all waiter side stands (resolved in favor of the Debtors prior to the hearing);
- Item 15 – Tavern on the Green logo canopy (partially resolved in favor of the Debtors, with respect to the canopy and side panels);

2

The Debtors, joined by the Official Committee of Unsecured Creditors, filed a response to the City's objection on January 7, 2010. They contended that the Disputed Items are property of the Debtors under the provisions of the License Agreement between the parties and that the Macari Report fails to support the contention that there would be irreparable damage to the premises from the removal of the Disputed Items.[2]

The parties' respective rights to the Disputed Items came on for a hearing on January 11, 2010. The Court heard testimony from Mr. Macari, the City's architect; and Michael S. Desiderio, chief operating officer of TOTG.

There is no dispute that the parties' rights to the Disputed Items are governed, in the first instance, by the License Agreement.

### The License Agreement

The License Agreement between the City and Leroy Adventures, Inc., one of the Debtors ("Licensee"), was dated May 16, 1985. Acknowledging a prior License Agreement dated December 20, 1973, and that pursuant thereto "Licensee has made substantial changes and alterations at Tavern-On-the-Green," the parties cancelled and annulled the earlier license, and the City granted a new 25-year license, effective October 1, 1984 and terminating December 31, 2009.[3] Annual license fees, which included a percentage of gross receipts, as defined, were established. The License acknowledged that Warner LeRoy ("LeRoy") was sole shareholder of the Licensee, and that he was responsible, on a non-exclusive basis, during his lifetime, for "supervising the operations

---

    o  Item 16 – miscellaneous ornamental lights (resolved in favor of the City prior to the hearing).

[2] The City submitted a Report by Anthony D. Macari, an architect employed by the City, as an exhibit to its objection to the sale. Mr. Macari also testified at the hearing described below.

[3] The License could be terminated earlier but any such early termination could not be arbitrary or capricious. (License, Art. II(a)).

3

of the Licensee" and devoting sufficient skill and energy "as may be reasonably required for the Licensed Premises to be properly managed."

The License Agreement, and in particular Exhibit A to the License Agreement, setting forth certain "General Provisions," contained the following clauses that are directly relevant to the dispute at bar. Exhibit A distinguished between "Expendable Equipment," defined as "all equipment, other than Fixed Equipment, provided by Licensee"; and "Fixed Equipment", defined as "any property affixed to Licensed Premises, which cannot be removed without irreparably damaging the Licensed Premises."[4] In Article 9, entitled "Title," the City represented that it had title to "all equipment listed on Exhibit C, but makes no representation of title as to other property located on Licensed Premises." Article 9(b) further provided that "Licensee represents that it or an affiliated company has title to all equipment listed on Exhibit D, entitled SCHEDULE OF FINE ARTS respectively, which is attached hereto and incorporated herein."

Article 9(c) further provided that "except for equipment listed on Exhibit D, title to Fixed and Additional Fixed Equipment vests in City immediately upon the affixing of said equipment. Licensee must acquire and affix Fixed and Additional Fixed Equipment as provided in Article 10." Article 10, entitled "Licensee's Acquisition of Fixed Equipment," in turn required licensee to notify the City of its intention to affix Fixed and Additional Fixed Equipment so that the City could approve or disapprove same, in its sole discretion, and so that Exhibit C could be amended appropriately. Article 12,

---

[4] Art. I, "Definitions" (f) and (g). In addition to the term "Fixed Equipment" the Lease also defines the term "Additional Fixed Equipment", meaning Fixed Equipment affixed "subsequent to the date of execution of this License"; and "Fixed and Additional Fixed Equipment", meaning Fixed Equipment and Additional Fixed Equipment "jointly and severally."

4

entitled "Obligation to Acquire," provided that "Licensee shall acquire, replace, install or affix, at its sole cost and expense, any equipment, materials and supplies required for the proper operation of Licensed Premises described herein or as reasonably required by" the City.

Finally, Article 11, entitled "Expendable Equipment," provided that Licensee would supply all Expendable Equipment; that title to "all Expendable Equipment and Fixed Equipment listed on Exhibit D shall remain in Licensee or in Maxwell's Plum, an affiliate of Licensee, and such equipment shall be removed by Licensee at the termination or expiration of this License" (Art. 11(b)); that equipment listed on Exhibit D must be removed "in such a way as shall leave no damage to the licensed premises" (Art. 11(c)); and that "Title to all Expendable Equipment not listed on Exhibit D shall be the property of Licensee and may be removed by Licensee at the termination or expiration of this license provided, however, that all stoves, ovens, refrigerators, cook's counters and dishwashing machines shall automatically become the property of the City upon such expiration and shall not be removed from the Licensed Premises" (Art. 11(d)).

All equipment had to be maintained to the City's reasonable satisfaction at Licensee's sole cost, and Licensee was required to "surrender the Fixed and Additional Fixed Equipment to which the City holds title in the same condition as said equipment was found by Licensee, reasonable wear and tear excepted." (Art. 13, entitled "Maintenance of Equipment and Condition Upon Surrender"). Further, at the expiration or termination of the License, "Licensee shall surrender Licensed Premises in at least as good a condition as said premises were found by Licensee at the beginning of this

5

License term, reasonable wear and tear excepted." (Art. 14, entitled "Surrender of Licensed Premises").

## DISCUSSION

As the City argues, the resolution of this dispute requires the construction of the License Agreement. Under New York law, the License Agreement, as an integrated contract, must be construed as a whole, without undue regard to specific sections, in order to give effect to the intentions of the parties. *South Road Associates, LLC v. Int'l Bus. Machines Corp.,* 4 N.Y.3d 272, 793 N.Y.S.2d 835, 826 N.E.2d 806 (2005).[5] "When the terms of the contract are clear and unambiguous the intent of the parties must be found within the four corners of the contract." City Objection at ¶ 9, citing *inter alia Signature Realty, Inc. v. Tallman*, 2 N.Y.3d 810, 781 N.Y.S.2d 259, 814 N.E.2d 429 (2004). "In searching for the probable intent of the parties the fair and reasonable meaning of the words control." *Id.*, quoting *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 450 N.Y.S.2d 460, 435 N.E.2d 1075 (1982).

The intent of the parties with respect to the Disputed Items is plain from the unambiguous provisions of the License Agreement. The License Agreement thus distinguishes between Fixed and Additional Fixed Equipment, on the one hand, and Expendable Equipment, on the other. Title to all Expendable Equipment is in the Licensee – one of the Debtors – or an affiliate. Title to Fixed and Additional Fixed Equipment is in the City and such equipment is listed on Exhibit C to the License Agreement, with one exception. Thus, Article 9(c) provides that "Except for equipment listed on Exhibit D, title to Fixed and Additional Fixed Equipment vests in the City immediately upon the affixing of said equipment." Exhibit D, in turn, contains a list of

---

[5] There is no dispute that New York law, which governs the License Agreement (Art. 35), is applicable.

6

all equipment—fixed and expendable—as to which "Licensee represents that it or an affiliated company has title . . . ."  (Article 9(b)).

The Disputed Items, of course, are not listed on either Exhibit C or Exhibit D to the License Agreement, and title thus depends on whether they are Fixed or Additional Fixed Equipment, on the one hand, or Expendable Equipment, on the other.  As quoted above, the License defines Fixed Equipment as "any property affixed to Licensed Premises, which cannot be removed without irreparably damaging the Licensed Premises," Additional Fixed Equipment is any Fixed Equipment affixed subsequent to the execution of the License, and Expendable Equipment is, in substance, everything else.  (Art. 1, Definitions).  The determination whether an item of equipment not listed on Exhibit C or D is Fixed or Expendable depends, in the first instance, on whether it can be removed "without irreparably damaging the Licensed Premises."  The definition of the term Fixed Equipment in the License in effect incorporates the law of New York on fixtures, which has been recently summarized as follows:

> Under the common law, a fixture is personalty which is: (1) actually annexed to real property or something appurtenant thereto; (2) applied to the use or purpose to which that part of the realty with which it is connected is appropriated, and (3) intended by the parties as a permanent accession to the freehold.  Less significance is accorded to the manner of annexation and more to the intention of the person annexing the property.  The permanency of the attachment does not depend so much upon the degree of physical force with which the thing is attached as upon the motive and intention of the party attaching it.  The intent which is regarded as controlling is not the initial intention at the time the [item] is acquired, nor the secret or subjective intention of the party making the attachment, but rather the intention which the law will deduce from all the circumstances.

*Mastrangelo v. Manning*, 17 A.D.3d 326, 327, 793 N.Y.S.2d 94 (2d Dep't 2005) (citations and internal quotes deleted).

In the instant case, the parties' intentions must be determined by reference to their contract as a whole. The permanency of the attachment and the Debtors' ability to remove the Disputed Items is a factual matter and was the subject of the hearing held January 11, 2010. There the Court took evidence with respect to the manner in which the Disputed Items were (or were not) affixed to the real property and are capable of being removed "without irreparably damaging the Licensed Premises". The evidence with respect to the three principal items in dispute revealed the following.

**1. Chestnut Paneling**

The City claims that certain "wormy chestnut wood paneling", which apparently is over 3,880 square feet in size and covers an entire wall and some additional space in and near the so-called Chestnut Room, is an item of Fixed or Additional Fixed Equipment within the meaning of the License Agreement and the New York law on fixtures. Although it was not listed on either Exhibit C or D to the License, there was testimony that it was installed in the 1970's. It is of considerable value.

The testimony at the hearing was clear that the chestnut paneling could be removed without irreparably damaging the physical condition of the premises. Michael Desiderio, the Debtors' chief operating officer, testified that it has been removed several times for repair or refurbishing, in whole and in part, and that it is much more practical to remove it for such purposes than to refurbish it in place. It is attached to the walls with nails, and the walls can be restored to their original condition after the nails are removed by spackling, sanding and painting.

The City did not seriously dispute the Debtors' contentions regarding physical removal of the paneling. Its claim that the paneling constitutes Fixed Equipment under

8

the License Agreement, or a fixture under New York law, rests on the contention of the City's architect that the paneling

> is integral to the architecture of the space, which is to say its removal will change the character of the space in a significant way…its removal will cause irreparable harm to the quality of the facility. The paneling in the hall brings unity to the facility and helps make the transition from the chestnut room to the other areas of the facility.

(Macari Report p. 1). However, neither the contract that the parties executed nor the law of New York on fixtures designates an item as "Fixed or Additional Fixed Equipment" or a fixture because of its importance to the interior "quality of the facility" or the role it plays in the "transition" from one room to the next, or because its removal would "change the character of the space in a significant way." The City cites no authority that the decorative importance of an item of personalty in and of itself causes such item to become a fixture. Nor did the parties agree otherwise in their contract. Fixed Equipment is defined as property capable of being removed "without irreparably damaging the premises." This has been construed as physical damage, and not harm to the "quality of the space;" otherwise a landlord could claim title to any work of art attached to a wall, on the theory that the work of art is the focal point of all of the remaining décor and that its removal would irretrievably damage "the quality of the space." *See In re Speyer's Will*, 35 N.Y.S.2d 705, 710 (Surr. Ct. West. Co. 1942) ("Paintings, tapestries and other works of art retain their characteristic nomenclature even when they are so firmly annexed to realty as to become a part thereof.").

In *Board of Managers of Soho Int'l Arts Condominium v. City of New York*, 2005 WL 1153752 (S.D.N.Y. May 13, 2005), the City argued that a certain work of art placed on the wall of a building was a fixture. The Court found to the contrary, stating:

9

> An examination of the evidence reveals that the Work was not intended to be a 'permanent accession' to the building . . . City Defendants attempt to argue that New York courts have found ornamentation or aesthetic improvement to a building to be a proper use or purpose when determining whether something is a fixture by citing cases where ornaments were found to be fixtures. However, the cases cited are more properly read as such ornaments constituting fixtures because of the manner in which they are affixed to the property rather than because they serve any use or purpose of the property.

*Id.* at *5 n. 13. The District Court also distinguished one case that the City also relies on here, *Snedeker v. Warring*, 12 N.Y. 170 (1854), stating that *Snedeker* was a case where "a statute was intended to be [a] permanent accession because it was placed on permanent mount and base." 2005 WL 1153752 at *5 n. 13. There is no permanent mount or base to which the chestnut paneling is installed, merely the walls.

The fact that the parties in the License Agreement did not intend to create a novel definition of the term Fixed Property is confirmed by Article 11(d) of the License Agreement. It is provided there that Expendable Equipment may be removed by Licensee

> at the termination or expiration of this License provided, however, that all stoves, ovens, refrigerators, cook's counters and dishwashing machines should automatically become the property of the City upon such expiration and shall not be removed from the Licensed Premises.

When the parties wanted to create special clarity as to what had to be left behind, they knew how to do it.

It is also worth noting that the chestnut paneling was installed at Tavern on the Green by the late Warner LeRoy, a flamboyant restaurateur who decorated his restaurant, as he had a prior venture, Maxwell's Plum, in a personal, eclectic style. The City contracted for his personal expertise in the License Agreement, requiring him, during his lifetime, to supervise the restaurant on a non-exclusive basis. Now that the City has

10

stated its intention to grant a license to a third party and not to LeRoy's heirs or those who would carry on his legacy, it is particularly inappropriate for the City to claim the right to ownership of those items of personalty that he installed and that can be removed without causing irreparable physical damage, merely because there would be arguable "irreparable damage" to a décor and environment closely connected with his persona. Indeed, there was evidence at the hearing that the City, in its Request for Proposals with respect to a new license for the premises, required prospective licensees to propose a new décor for the restaurant. Since the City seems to desire a change in the quality of the space, it is particularly inappropriate for it to claim title to an item of personalty because it would damage the old décor.

**2. Park Room Mural**

The same conclusions follow with respect to the second major item under dispute, the Park Room mural. Like the Chestnut Room paneling, the removal of this mural would, according to the City's architect, "cause irreparable damage to the quality of the space." The "quality of the space" does not, however, belong to the City. The unrebutted testimony was that the mural is painted on canvas and could be removed, like wallpaper, without causing irreparable physical damage or any physical damage at all to the premises. Since the painting also depicts the LeRoy family, it is particularly unlikely that there was an intention on LeRoy's part to leave it behind in the event that the City allowed the 1985 License to expire and awarded the premises to a third party.

The sole additional issue relating to the mural is that the City contends that it may be a replacement of a prior mural or painting. The City's architect states that "The exhibit C list of City property makes mention of a French garden wall and ceiling mural

11

in the front that seems to have been replaced by the existing Park Room mural." (Macari Report p. 2). However, the evidence at the hearing that the mural is a replacement of a prior mural that the parties deemed City property was inconclusive. The City's architect admits to uncertainty in his report and the record at the hearing was not any more definitive. Payment of the initial cost for the installation of an item of personalty may bear on the question of whether the parties intended the item to become a permanent accession to the realty. *See Marine Midland Trust Co. of Binghamton v. Ahern*, 16 N.Y.S.2d 656, 660 (Sup. Ct. Broome Co. 1939). However, since the facts are uncertain, the Court has not relied on this point in connection with this Opinion, one way or the other.[6]

Moreover, the License Agreement does not deem an item of personalty a fixture because it might have replaced an item on Exhibit C, no matter how much more valuable. The City's objection also cites Article 10, requiring the Licensee to notify the City of its intention to affix Fixed and Additional Fixed Equipment so that the City could amend Exhibit C, and Article 12, which required Licensee to "acquire, replace, install or affix, at its sole cost and expense, any equipment, materials and supplies required for the proper operation of the License Premises . . . ." These provisions, however, do not override the definitions of Fixed and Expendable Equipment. The contract does not provide that the penalty for the Licensee's failure to keep the list of items or Exhibit C up to date is forfeiture of a valuable item of personalty. Further, the City has its remedies in the event

---

[6] In any event, there is no basis for the City's contention that the terms of a prior license between the parties should control with respect to the payment of the purchase price for an item and whether an item is Fixed Property within the meaning of the 1985 contract. The 1985 contract does not incorporate any prior agreement but is plainly a novation. *See Sudul v. Computer Outsourcing Services, Inc.,* 917 F. Supp. 1033, 1047 (S.D.N.Y. 1996). The agreement that is now binding and applicable is the 1985 contract, and the parties' intentions must be determined with reference thereto.

12

it can demonstrate that the Licensee failed to replace property in violation of the Agreement or to turn over the Fixed Equipment "in the same condition as said equipment was found by Licensee, reasonable wear and tear excepted." (Art. 13). Suffice it to say that the City's rights are reserved with regard to any claim for damages it may have under the License Agreement.[7] As to the issue now before the Court, the Debtors have established that the Park Mural is not Fixed Equipment under the License Agreement and applicable New York law on fixtures.[8]

### 3. Plaster Decorations on the Custom Plaster Ceiling

The third major item in dispute encompasses certain plaster decorations affixed to the ceiling in the Crystal Room. There is no dispute that certain of these figures, those that represent human figures or angels, are listed on Exhibit D as property of Maxwell's Plum, and are not the City's property. There are, however, a large number of additional items that are floral or geometric in design and that are disputed.

The City's architect admitted at the hearing that these decorations could be removed without causing irreparable physical damage to the realty. The only distinction from the chestnut paneling and the Park Room mural is that these are affixed to the ceiling and are of a significant number. In light of the evidence that they can be and have been removed from the ceiling without causing "irreparable damage", the Court finds that

---

[7] The City admits that its remedies with respect to the turnover are different when it contends in its Objection that the City "is either entitled to the replacement of these items or the value of the old items." (Objection ¶ 42).

[8] The City also relies on *Roberts v. Yancey*, 209 Va. 537, 165 S.E.2d 399 (1969), where the Virginia Supreme Court of Appeals, applying Virginia law, found it was a question for the jury whether defendants were liable in damages for having left premises "in a condition aptly described in the plaintiff's brief as 'truly foul.'" *Id.* at 540. The Virginia Court, based on all of the evidence, found that certain items were properly found by the jury to be fixtures which the defendants were not entitled to remove. In the present case, based on all of the evidence and the parties' contract, the Court finds that most of the Disputed Items were not intended to be permanent accessions to the realty but that the City's right to damages is reserved in the event that the Debtors leave the premises in a condition that, whether or not "truly foul", violates the 1985 License Agreement.

13

their number and placement is not a substantial enough difference to cause them to be deemed Fixed Equipment.

**4. Additional Items**

The additional items disputed by the parties can be dealt with summarily by reference to the principles set forth above, as follows:

A. Six banquettes. The evidence is that these can be removed by the turn of a bolt and that their removal would not cause "irreparable damage." The evidence was also that they did not replace prior City property. The City's claim is rejected.

B. Lighting fixtures such as stage lighting, and light ports for the dance floor and disco. The evidence at the hearing showed that these items could be and frequently have been easily removed and cannot reasonably be deemed Fixed Property.

C. The sole exception to the conclusions stated above is the frame to the canopy at the outside entrance to the restaurant. There was no clear testimony that the metal frame could be easily removed from the ground or that it had been so removed. As it is part of the exterior of the building, other issues have been raised. The City does not claim the canopy itself, and under the circumstances its right to the metal frame is sustained.

## **CONCLUSION**

The Debtors can proceed with the auction of all of the Disputed Items, with the exception of the frame of the canopy and the ornamental lights whose status was resolved by the parties in favor of the City.

**IT IS SO ORDERED.**

Dated:  New York, New York
        January 12, 2010

                                            */s/ Allan L. Gropper*
                                            UNITED STATES BANKRUPTCY JUDGE