Norman N. Kinel
**DUVAL & STACHENFELD LLP**
101 Park Avenue, 11th Floor
New York, NY 10178
Telephone: (212) 883-1700
Facsimile: (212) 883-8883
Email: nkinel@dsllp.com

*Counsel for Official Committee of Unsecured Creditors
of Tavern on the Green Limited Partnership, et al.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                  )
**In re:**                                        )    **Chapter 11**
                                                  )
**TAVERN ON THE GREEN**                           )    **Case No. 09-15450 (ALG)**
**LIMITED PARTNERSHIP, et al.,**                  )    **Case No. 09-15448 (ALG)**
                                                  )
                            **Debtors.**          )    **(Jointly Administered)**
                                                  )
-------------------------------------------------------------------x

**MOTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF TAVERN ON THE GREEN
LIMITED PARTNERSHIP, ET AL. FOR AN ORDER
CONVERTING THE DEBTORS' CHAPTER 11 CASES TO
<u>CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE</u>**

The Official Committee of Unsecured Creditors (the "Committee") of Tavern on the Green Limited Partnership ("Tavern on the Green" or "Tavern") and LeRoy Adventures, Inc. (collectively with Tavern, the "Debtors"), the debtors and the debtors-in-possession in the above captioned Chapter 11 cases, by and through its counsel, Duval & Stachenfeld LLP, hereby submits this motion (the "Motion") for an order converting these Chapter 11 cases to cases under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). In support of the Motion, the Committee respectfully submits as follows:

**PRELIMINARY STATEMENT**

1. Largely as a result of pervasively pernicious conduct by the City of New York (the "City"), efforts to liquidate debtor Tavern on the Green in a manner that could result in a material recovery to unsecured creditors have run into a brick wall. Through its litigiousness at every turn, the City has materially interfered with the Debtors' efforts to maximize the value of their estates and has caused the estates needlessly to incur millions of dollars in administrative expenses.

2. The Debtors' estates are currently administratively insolvent, with the only apparent significant asset remaining to be monetized – and which could serve as the source of *any* material recovery to unsecured creditors – being the "TAVERN ON THE GREEN" trademark/service mark (the "Tavern Mark"), which remains under a toxic cloud of uncertainty resulting from the City's claim of ownership thereto.[1] Despite months of negotiations attempting fairly to resolve the ownership dispute *outside of a courtroom* – negotiations in which the Committee has been fully engaged – no meaningful progress has been made with the City, whose position with respect to the Tavern Mark remains intractable.

3. Even prior to its assault on the estates' ownership of the Tavern Mark, the City fomented such a high degree of uncertainty among the public as to whether Tavern was or would remain open through the 2009 holiday season – historically its most profitable time of year – that Tavern's restaurant operations through its closing were *unprofitable*, with the City having adversely affected anticipated bookings and *a la carte* restaurant traffic. Moreover, the City's gratuitously belligerent position with respect to providing Tavern sufficient time to remain at the

---

[1] Cross-motions for summary judgment (the "Summary Judgment Motions") with respect to ownership of the Tavern Mark are *sub judice* before the Honorable Miriam Goldman Cedarbaum in the District Court for the Southern District of New York (the "District Court").

2

Central Park location (the "Premises") following the termination of its restaurant operations forced the liquidation of the Debtors' physical assets on such a tight timetable that their value certainly was not maximized.

4. All of these actions by the City evidently were part of a seriously flawed plan to oust Tavern (and the LeRoy family) in favor of a putative new licensee who claimed to be ready to open a new restaurant at the Premises on January 1, 2010, which claim was repeatedly echoed by the City. However, that claim is utterly belied by the fact that, as of the date hereof, (a) the City has yet even to confirm that it has signed a license for operation of a restaurant at the Premises with the putative licensee; (b) the putative licensee purportedly still lacks the needed financing to honor the enormous financial commitments made to the City in connection with his bid; (c) no agreement between the putative licensee and the labor union which represents Tavern's former employees has been announced; and (d) the Premises, stripped bare of all that made Tavern an iconic destination and unique dining experience for millions of people worldwide, now sits as an empty shell, indefinitely abandoned while its 400 strong workforce remains unemployed.[2] Indeed, based on information provided by reliable restaurateurs and others with familiarity with Tavern's former operations, it is likely to be *1-2 years* before a new restaurant at the Premises is fully up and running, potentially resulting in millions of dollars in lost revenue to the City and the other businesses which benefited from Tavern's former status as the highest or second highest grossing restaurant in the Country.

5. In sum, in large part as a result of the actions of the City, the Debtors' creditors are unlikely to receive any recovery in these Chapter 11 cases. Instead, the sole creditor

---

[2] The Committee believes that the City has engaged in highly inequitable conduct during the course of the Debtors' Chapter 11 cases and strongly urges that any trustee appointed investigate the City and its putative licensee in order to determine whether a basis exists for the equitable subordination of the City's claims against the Debtors' estates and/or any potential affirmative recoveries that may exist against the City or the putative licensee.

beneficiary to date of the liquidation of Tavern's business has been the Debtors' secured lender, TD Bank, N.A. ("TD Bank"), which has a lien on virtually all of the Debtors' tangible and intangible assets. However, although continuing to benefit from the Chapter 11 process, TD Bank remains unwilling to provide meaningful additional ongoing funding of the administrative costs that are being accrued on its behalf in maintaining the Debtors' cases in Chapter 11, necessitating their conversion to Chapter 7.

6. The Committee believes that the battles fought with the City and the other efforts made in order to keep Tavern open through the 2009 holiday season were not for naught, because (a) substantial benefits were obtained by Tavern's dedicated employees (in the form of continued employment during the last quarter of 2009 and contributions made by Tavern to the employees' health and welfare funds); (b) the Debtors' estates avoided potentially significant WARN Act claims that could have resulted from termination of Tavern's employees without legally sufficient notice; (c) Tavern's vendors were able to continue doing business with Tavern during the holiday season; and (d) there was at least some time to arrange an orderly auction at the Tavern Premises.

7. However, the Committee has come to the reluctant but firm conclusion that the Debtors' estates can at this point be best and most efficiently administered in a Chapter 7 proceeding, where a trustee and a single set of professionals can (a) conclude the wind-down of the Debtors' estates, (b) continue the ongoing litigation with the City over the Tavern Mark, (c) market and sell the Tavern Mark, and (d) commence any appropriate litigation against third-parties. Accordingly, for these reasons and the reasons more fully set forth below, the Committee hereby respectfully moves this Court for immediate conversion of the Debtors' Chapter 11 cases to cases under Chapter 7.

## REQUEST FOR RELIEF

8. Conversion of the Debtors' cases to Chapter 7 is mandated here because they are administratively insolvent and there is neither a business to reorganize nor a material advantage or ability at this point in time to liquidating under Chapter 11. The Debtors have shut down their operations, discharged all of their employees and sold off their tangible assets. Continuation in Chapter 11 would entail additional fees and expenses that will not be incurred in Chapter 7, including the fees of multiple sets of professionals (those of the Debtors, the Committee, TD Bank and "Equity").[3] Accordingly, the Committee respectfully requests that the Debtors' Chapter 11 cases be immediately converted to Chapter 7.

## ARGUMENT

### A. Because the Debtors Estates are Administratively Insolvent, Cause Exists for Immediate Conversion of these Cases to Chapter 7

9. The Debtors ceased operating their Tavern-on-the-Green restaurant as of December 31, 2009. The post-petition operations of Tavern failed to net the $1 million - $2 million in profit that the Debtors had optimistically projected at the outset of these cases. The three-day auction of the highly-touted art, antiques, chandeliers and other items located at the Premises resulted in a recovery to the Debtors of *less than one-quarter* of their $8 million appraised value. The Tavern Mark, purportedly the most valuable asset of the estates, has yet to be monetized due to the City's pursuit of its claim of ownership, hoping to rob the Debtors of the goodwill created in the mark by Tavern's owners over decades.

---

[3] Although the Committee has been generally supportive of the Debtors' efforts throughout their Chapter 11 cases, including in opposing the City's efforts to de-value the Tavern estates in multiple ways, the Committee has also been continuously frustrated by what it believes to be the inefficient and at times, ineffective administration of these cases by the Debtors and various of their professionals. In addition, although the fees of the professionals retained by the "equity" interests in the Debtors are not borne directly by the Debtors' estates, the involvement of such professionals in virtually all aspects of the Debtors' cases has called into question the independence of the Debtors and has indisputably had the effect of increasing the fees of *all* the estate-retained professionals, who were required to interact with equity's professionals on a regular basis, even long after it became clear that it was virtually impossible that there would be any return for equity interests in these cases.

10. Conversion of a Chapter 11 case to a Chapter 7 proceeding is mandatory upon a showing of "cause." See 11 U.S.C. § 1112(b)(1) ("[O]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause."). Although not exhaustive, section 1112(b) of the Bankruptcy Code identifies various circumstances that constitute cause, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." See 11 U.S.C. § 1112(b)(4)(A).[4] "[T]he satisfaction of one subsection of §1112(b) is sufficient to show cause." See Loop Corp. v. United States Tr., 379 F.3d 511, 515 n.2 (8th Cir. 2004); see also In re Fed. Roofing Co., 205 B.R. 638, 641 (Bankr. N.D. Ala. 1996).

11. Cause can be shown by, among other things, establishing that the debtor has incurred losses or maintained a negative cash flow. See, e.g., In re AdBrite Corp., 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) (cause existed to convert the Chapter 11 cases in part because of the debtor's negative cash flow postpetition and inability to pay current expenses); In re 3868-70 White Plains Rd, Inc., 28 B.R. 515, 519 (Bankr. S.D.N.Y. 1983) (cause existed to convert a Chapter 11 case to a Chapter 7 where the debtor's assets were fully collateralized and it has negative cash flow coupled with an inability to pay current expenses); Loop Corp., 379 F.3d at

---

[4] Rehabilitation of a debtor "means to put back in good condition; re-establish on a firm, sound basis." See In re V Cos., 274 B.R. at 725 (internal quotations and citation omitted). "Rehabilitation signifies that the debtor will be reestablished on a sound financial basis, which implies establishing a cash flow from which current obligations can be met." In re Rundlett, 136 B.R. 376, 380 (Bankr. S.D.N.Y. 1992) (granting creditors' motion to convert chapter 11 case to chapter 7 where the debtor's use of the estate property resulted in continuing loss or diminution of the estate, there was not a reasonable likelihood of rehabilitation and the debtor would be unable to effectuate a plan) (citing In re Kanterman, 88 B.R. 26, 29 (S.D.N.Y. 1988)) (affirming conversion of chapter 11 case to chapter 7 upon creditors' showing of continuing diminution to the estate and absence of reasonable likelihood of rehabilitation).

515-16 ("In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow - including that resulting only from administrative expenses - effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of § 1112(b)(1)…") (internal citation omitted).

12. Here, most significantly, the Debtors are administratively insolvent and there continues to be ongoing loss to and diminution of the Debtors' estates. In that regard, annexed hereto as Exhibit "A" is an analysis prepared by the Committee's financial advisors – CRG Partners Group, LLC ("CRG") – of the current financial condition of the Debtors' estates. In sum, the Debtors are currently administratively insolvent by more than $5.8 million, with TD Bank still owed approximately $2.1 million and an estimated $3 million in accrued but unpaid professional fees. Based on CRG's analysis, the Debtors would have to realize at least $5.8 million from a sale of the Tavern Mark, collection of remaining auction proceeds, collection of various outstanding receivables (including a $1.6 million dollar receivable from the Debtors' Chief Executive Officer, Jennifer LeRoy) and any potential causes of action, such as preferences, fraudulent conveyances or actions against the Debtors' insiders (to the extent any are found to exist) *just to pay off TD Bank and bring the estates to administrative solvency before one dollar would be returned to unsecured creditors*. The Committee believes that this is unlikely to occur, particularly given the ongoing trademark litigation, the depressive effect that such litigation already has had on the value of the Tavern Mark and the huge stumbling block that the litigation presents with respect to efforts to successfully market and sell the Tavern Mark. Accordingly, immediate conversion of the Debtors' Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code is necessary in order to prevent further loss and diminution to the Debtors' estates.

13. It cannot be disputed that there is a continuing loss to and diminution of the Debtors' estates. The Debtors are currently out of business; have liquidated virtually all of their tangible assets and are not intending to reorganize. The best the Debtors – and the Committee – could have hoped for in these cases was that the Debtors could confirm a liquidating Chapter 11 plan. However, this appears no longer feasible, as the Debtors have no ability even to pay the ongoing administrative expenses of their Chapter 11 cases.

### B. As a Result of the Actions of the City, Virtually No Prospects Exist for the Debtors to Confirm a Liquidating Chapter 11 Plan

14. As discussed above, the Debtors are administratively insolvent and administrative expenses continue to accrue, eroding the possibility of any funds being available for distribution to the Debtors' creditors. See In re Clarkson, 767 F.2d 417, 420 (8th Cir. 1985) (dismissing Chapter 11 case because the debtor lacked a certain source of income and "the position of the creditors have continued to erode as the life of the debt has been lengthened without any appreciable increase in the likelihood of their satisfaction"). Although rehabilitation was never the goal of these Chapter 11 cases, largely as a result of the actions of the City, reorganization, even in the sense of confirming a liquidating plan, has been rendered nearly impossible.

15. At every turn of these Chapter 11 cases, the City has bombarded the estates with largely needless objections, claims and complaints, including, (a) objecting to the Debtors' use of cash collateral; (b) objecting to the debtor-in-possession financing agreement with TD Bank; (c) objecting to the Debtors' request to remain in the Premises beyond December 31, 2009 so that the Debtors might be able to maximize the value of their assets through an orderly and timely sales process; (d) commencing an adversary proceeding and moving for summary judgment with respect to its purported claim of ownership of the Tavern Mark; (e) moving to withdraw the reference of the trademark dispute to the District Court; (f) seeking to modify the automatic stay

so that *the City* could use the Tavern Mark after the expiration of the Debtors' license to run a restaurant at the Premises; (g) objecting to the Debtors' retention of an auctioneer and to conducting an auction of the valuable contents of the Tavern restaurant at the Premises; (h) objecting to the Debtors' sale of their Queens warehouse; (i) objecting to the Debtors' retention of an intellectual property advisory firm in order to market and sell the Tavern Mark and other intellectual property of the Debtors; and (j) objecting to the sale by the Debtors of certain property located at the Premises on the erroneous basis that such items (the "Disputed Items") belonged to the City.[5]

16. In addition to the foregoing, there is an entire separate docket in the District Court – which, at the City's request, withdrew the reference of the Tavern Mark dispute – that is similarly burdened with voluminous pleadings filed by the City, including an entire second round of briefing on the pending Summary Judgment Motions subsequent to oral argument thereon as a result of the City's failure to substantiate its arguments with legal authority in the first instance.

17. Even within the last few days, the City has launched a fresh attack on the Debtors and their estates by filing a motion seeking immediate payment of alleged administrative expenses totaling in excess of $550,000, while conceding in the very motion itself that a substantial portion of the claims are *not* administrative at all, but have instead allegedly attained that status by virtue of some alleged *de facto* assumption by the Debtors of their now-expired license agreement with the City. *See* Motion and Memorandum of Law of the City of New York for an Order Authorizing and Directing Payment of Outstanding Expenses Under the License Agreement, dated February 16, 2010 [Docket No. 171]. Even putting aside the merits of its

---

[5] It is worth noting that after forcing a lengthy evidentiary hearing on the Disputed Items, this Court ruled in the Debtors' favor on all but one of them, and thereafter the City purchased the disputed items at a cost of nearly *twice the amount* that the Debtors were prepared to sell them to the City before litigation. The legal fees incurred in connection with this petty dispute are all attributable to the City's intransigence and unwillingness to negotiate in good faith with the Debtors or the Committee virtually any issue.

latest motion (or lack thereof), the City wholly ignores the fact – which even a cursory review of the Debtors' monthly operating reports reveals – that the Debtors have virtually no available cash with which to pay any such purported administrative expenses. Nevertheless, the City will undoubtedly persist in waging yet another wasteful fight over payment of a trumped-up administrative claim, causing further bleeding of the estates through additional needless City-originated litigation, to the detriment of all other creditors in the Debtors' cases.

18. Unfortunately, *all* creditors of the Debtors' estates have borne the enormous harm caused by the City's vexatious litigation tactics, with the assets of the estates having all but dwindled away. The City's conduct not only has adversely affected the value of the Debtors' assets, but has also burdened the Debtors' estates with considerable professional fees and expenses, which in tandem have sounded the death knell for any prospect of meaningful recoveries to unsecured creditors.

### C. The Debtors' Chapter 11 Cases Should Not be Maintained Solely for the Benefit of their Secured Lender, TD Bank

19. To date, the liquidation of the Debtors' assets has benefited only one party – TD Bank, the Debtors' only significant secured creditor, which has a lien on virtually all of the Debtors' assets (other than the proceeds of avoidance actions). A Chapter 11 case benefiting only a secured party and not maximizing the value of the estate for all creditors should be converted to Chapter 7. See generally Deborah L. Thorne, Resolved: Administrative Insolvent Cases Should Not Be Administered Solely for the Benefit of Secured Creditors, AM. BANKR. INST. (2008).

20. Administering a Chapter 11 case for the sole benefit of a secured creditor results in a windfall to the secured creditor, because it receives the benefits of the process without bearing any of its cost. See In re JKJ Chevrolet, Inc., 26 F.3d 481, 483 (4th Cir. 1994). Such

windfalls are not favored, which is why the Bankruptcy Code contains Section 506(c), whose purpose "is to prevent a windfall to a secured creditor at the expense of the estate."[6] See In re Smith Int'l Enters., 325 B.R. 450, 453 (Bankr. M.D. Fla. 2005); In re JKJ Chevrolet, Inc., 26 F.3d at 483 (holding that the central purpose of Section 506(c) of the Bankruptcy Code allowing surcharge of secured creditor's collateral to recover administrative expenses is to prevent windfall to secured creditor at bankruptcy estate's expense). Accordingly, courts have allowed debtors to recover costs from the secured creditor where the costs were incurred for the sole benefit of the secured creditor. See In re Dyac Corp., 164 B.R. 574 (N.D. Ohio 1994) (holding that a trustee may recover from secured creditor's collateral reasonable and necessary expenses of preserving the collateral); In re Hen House Interstate, Inc., 177 F.3d 719, 723-724 (8th Cir. 1999) (same).

21. Unfortunately, in the instant case, in connection with their obtaining debtor-in-possession financing from TD Bank, the Debtors waived any potential 506(c) rights against TD Bank. TD Bank, however, continues to benefit from the Chapter 11 process in a variety of ways, including through the services of estate-retained professionals, while at the same time is unwilling to provide meaningful ongoing funding of the administrative costs of maintaining the Debtors' cases in Chapter 11. TD Bank also continues to enjoy the benefit of having its claims – as well as the accruing fees of its own professionals – secured by all of the Debtors' assets, including the Tavern Mark.

22. Chapter 11 cases should be conducted to rehabilitate or liquidate the debtor for the benefit of creditors generally and should not be allowed to proceed if this objective cannot be

---

[6] Section 506(c) of the Bankruptcy Code provides as follows: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."

11

met.  In re Timbers of Inwood Forest Assoc., Ltd., 808 F.2d 363 (5th Cir. 1987), aff'd., 484 U.S. 365 (1988) (without a rehabilitative purpose, the "statutory provisions designed to accomplish the reorganizational objectives become destructive of the legitimate rights and interests of creditors."); In re Little Creek Dev. Co., 779 F.2d 1068, 1072 (5th Cir. 1986); In re C-TC 9th Avenue P'ship, 113 F.3d 1304, 1311 (2d Cir. 1997).

23.     The purpose of these Chapter 11 cases was *not* solely to benefit TD Bank.  While TD Bank and its professionals will almost certainly be paid in full, unsecured creditors, many of whom are small business trade vendors, are unlikely to recover *any* of their pre-petition claims.

## CONCLUSION

24.     Conversion of the Debtors' Chapter 11 cases to Chapter 7 is mandated here, because there is neither a business to reorganize nor is there any longer the ability to continue to liquidate under Chapter 11 due to administrative insolvency.  The Debtors have shut down their operations and sold off all of their tangible assets.  Because only the slimmest of possibilities exist that a Chapter 11 plan could ever be confirmed, cause exists for converting the Debtors' cases to Chapter 7.

**WHEREFORE**, for all the foregoing reasons, the Committee respectfully requests that this Court enter an order in the form attached hereto as Exhibit "B," converting the Debtors' Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code, and granting the Committee such other and further relief as is just and proper.

Dated: New York, New York
February 22, 2010

                **DUVAL & STACHENFELD LLP**

                By:    /s/Norman N. Kinel
                        Norman N. Kinel
                        101 Park Avenue, 11th Floor
                        New York, New York 10178
                        Telephone:    (212) 883-1700
                        Facsimile:    (212) 883-8883
                        Email:    nkinel@dsllp.com

                        *Counsel for Official Committee of Unsecured Creditors of Tavern on the Green Limited Partnership, et al.*