MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for the City of New York
100 Church Street, Room 5-223
New York, New York 10007                         **Hearing Date: 3/4/10 at 11:00 a.m.**
(212) 788-0688                                   **Objection Deadline: 3/3/10, noon**
Gabriela P. Cacuci (GC-4791)
gcacuci@law.nyc.gov

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re:                                           Chapter 11

TAVERN ON THE GREEN L.P., et al.                 Case No. 09-15450 (ALG)
                                                 Case No. 09-15448 (ALG)
                         Debtors.                (Jointly Administered)

---------------------------------------------------------x


## OBJECTION OF THE CITY OF NEW YORK TO (I) MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO CONVERT THESE CHAPTER 11 CASES TO CHAPTER 7 AND (II) PROPOSED TD BANK N.A.'S SETTLE ORDER LIFTING THE AUTOMATIC STAY


TO:    THE HONORABLE ALLAN L. GROPPER
       UNITED STATES BANKRUPTCY JUDGE

              The City of New York and its Agencies (the "City"), including but not limited to,

the New York City Department of Parks ("Parks"), the New York City Water Board (the "Water

Board") and the New York City Department of Finance ("DOF"), by their counsel, Michael A.

Cardozo, Corporation Counsel of the City of New York, hereby submit this Objection to (I) the

Motion of the Official Committee of Unsecured Creditors (the "Committee") for an Order

Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code

(the "Conversion Motion") and (II) the proposed TD Bank N.A.'s Settle Order Lifting the

Automatic Stay (the "Settle Order"). The Conversion Motion was brought by Order to Show

Cause signed on February 22, 2010 (the "OSC"), shortening the notice period, and scheduling a

hearing for March 4, 2010 at 11:00 a.m. (the "Conversion Hearing"). The Settle Order is also made returnable on the same date and time as the Conversion Motion.

## Background

1. Since the City's February 16, 2010 Motion for an Order Authorizing Payment of Outstanding Expenses Under the License Agreement (the "City's Motion") is pending, the City will not unnecessarily repeat the factual background of these cases but rather incorporate herein by reference its statement of facts from the City's Motion. All capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the City's Motion.

## Preliminary Statement

2. The Committee's Conversion Motion, brought by Order to Show Cause and made returnable precisely on the date when the Committee and the Debtors are due to respond to the City's Motion, is nothing more than a ploy to divert the creditors' attention from the fact that estate representatives, including the Committee, have expended enormous amounts of money in a very short period of time without producing any tangible results. Faced with the need to explain to its constituency (of which the City is not part) and this Court how these Chapter 11 cases have suddenly morphed from projected full recovery by unsecured creditors to significant administrative insolvency, an ugly about face was, understandably, necessary. It is a well known fact that driving in the wrong direction requires a U turn at some point.

3. A $1.9 million projected secured claims deficit and $3.9 million administrative claims deficit is a drastically different scenario, indeed, the opposite of, what counsel for the Debtors, the Le Roy family members ("Equity"), the Committee, and even TD Bank, N.A. ("TD Bank" or the "Lender") have led this Court and the creditors – including the

City -- to believe since these cases were filed in September, 2009. The City was always kept in the dark about what and when the Debtors intended to do with the Restaurant premises, the fixtures owned by the City or other properties on which the City had liens. Things have not been that different since the Court approved the sales of the Debtors' properties. Despite numerous attempts, the City has yet to find out whether the Debtors have satisfied the City's first liens, as required by the Queens warehouse sale order (the "Queens Warehouse Sale Order"), and the Debtors have failed to comply with their obligations to provide information to the City concerning the amounts received from the Auction, as required by this Court's December 31, 2009 auction sale order (the "Auction Sale Order").

4.       Thus, while the Committee has embarked on a campaign to vilify the City by accusing it of engaging in "highly inequitable conduct during the course of the Debtors' Chapter 11 cases" (see Conversion Motion at p. 3, ftn. 2), with respect to which the City is reserving all of its rights, it is the estate representatives, including the Committee -- a knowing participant in the Debtors' misguided strategy -- that are concealing facts and failing to comply with this Court's orders. The Committee's Conversion Motion is allegedly based on an analysis prepared by the Committee's financial advisors – CRG Partners Group, LLC ("CRG") – which shows that "the Debtors are currently administratively insolvent by more than $5.8 million, with TD Bank still owed approximately $2.1 million and an estimated $3 million in accrued but unpaid professional fees". (Conversion Motion at ¶ 12).   But it was the Committee, together with the Debtors, the Equity  and even the Lender, that fought the City's efforts for more transparency in the cases, primarily with respect to information concerning the Debtors' collection of assets and the application of sale proceeds to reduce the Lender's secured indebtedness.  And, for the first time, the Committee refers in a public filing to an alleged

outstanding receivable in the amount of $1.6 million "from the Debtors' Chief Executive Officer, Jennifer LeRoy."[1] (Id.).

5.     The Committee blames everyone but itself for the procedurally defective, inefficient, heavy handed, redundant, disorganized, and ineffective handling of these estates' administration but it did nothing to temper the Debtors' and Equity's inclinations to overspend inexistent estate funds or to control their unrealistic assumptions, expectations or unbridled optimism concerning what the Debtors' few assets might be worth.

6.     The facts paint a different picture.  The Committee jumped on the band wagon, often echoing each step – or misstep – taken by the Debtors, instead of bringing some degree of reasonableness to the table.  It was the Committee that adamantly refused from the very beginning to include the trade name in the parties' holdover negotiation, that joined in the Debtors' baseless injunctive action against the City seeking to extend the expiration date of the License Agreement, that insisted on being the conduit through which all negotiations concerning holdover had to take place, that refused to make any reasonable offer for a concurrent use of the name, and that moved to "intervene" in the Debtors' trademark litigation with the City, so that it can submit a set of duplicate papers.  Even the District Court noted that it should not hear the same argument "twice."

7.     The fact that in a simple Restaurant liquidating case, which is not even six months old, the Lender has apparently incurred "professional fees of $685,000" and estate professionals have amassed approximately $3 million in fees, is indeed shocking but not totally surprising considering the Debtors' and the Committee's retention of an entire roster of

---

[1] Hereinafter, the "Le Roy Receivable".

unnecessary advisors and professionals, these advisors' and professionals' attendance of frequent, hours' long, court appearances, conferences, meetings and negotiating sessions. At the very least, it is disingenuous to support such retentions and yet express surprise at the cost incurred as a result thereof.

8. The Committee's chief complaint when all is said and done is that the City vigorously defended its interests in this case. The City has not only a right but a duty to its citizens and taxpayers to protect its interests in every bankruptcy case being filed in this or other Districts. Its involvement in these Chapter 11 cases was directly related and limited to, protecting its assets, namely, the Tavern on the Green premises of which it is the landlord, its trade name, the priority and satisfaction of its liens and claims, whether with respect to the Tavern premises or the Debtors' Queens warehouse, and the retention of personal property that had become affixed to the Tavern premises. No one should question that the City's actions in these cases amount to no more than standard, legitimate, bankruptcy practice totally supported by, and consistent with, the Bankruptcy Code and applicable rules and orders of this Court. Under no circumstances can the City be held responsible for the Debtors', the Equity's, the Committee's or even the Lender's attempt to deflect attention from their incurring of expenses by complaining of the City's defense of its interests.

**Conversion to Chapter 7 Is Not Appropriate
Where All Assets Have Been Liquidated**

9. There is no question that "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" is one of the ten listed factors that can constitute "cause" for conversion or dismissal of a Chapter 11 case. See 11 U.S.C. § 1112(b)(4)(A). However, conversion is not "mandatory" upon a showing of "cause" as argued by the Committee. (Conversion Motion at ¶ 10.) Section 1112(b)(1) expressly states that

the Court "shall convert a case under this chapter to a case under chapter 7 <u>or dismiss a case</u> <u>under this chapter, whichever is in the best interests of creditors and the estate</u>" if the movant shows "cause" and "absent unusual circumstances specifically identified by the court that establish that the requested conversion <u>or dismissal</u> is not in the best interests of creditors and the estate". <u>Id</u>. (Emphasis added).

10. The Committee addresses only conversion and not dismissal of the cases and thus deals only with the first part of the analysis required under Section 1112(b), namely, the existence of "cause", but not whether conversion <u>or dismissal</u> is in the best interests of the estates. Moreover, the Committee focuses solely on the alleged "loss and diminution of the estate assets" but does not discuss the second prong of the "absence of a reasonable likelihood for rehabilitation" (<u>see</u> <u>In re Denrose Diamond</u>, 49 B.R. 754, 756 (Bankr. S.D.N.Y. 1985)), nor the existence of any unusual circumstances that may disfavor conversion, such as the pending trademark action in the District Court. If "cause" is shown, the Court had broad discretion to either convert or dismiss the Chapter 11 cases. <u>In re Adbrite Corp.</u>, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003).

11. If these cases cannot remain in Chapter 11, the City favors dismissal over conversion because, as shown below, the Debtors have already liquidated their assets and distributed most of the proceeds, the parties' remaining disputes can be litigated in other *fora* and no further expenses will be incurred by these estates. <u>See</u> <u>In re 3868-70 White Plains Road, Inc.</u>, 28 B.R. 515 (Bankr. S.D.N.Y. 1983) (granting UST's dismissal motion where, in addition to breaching its fiduciary obligations, the debtor had no unencumbered assets, no new source of funds and the liquidation of the assets inured only to the benefit of the secured lender), citing

with approval. In re CNN Realty Corp., 23 B.R. 261 (Bankr. S.D.N.Y. 1982) and In re Coram Graphic Arts, 11 B.R. 641 (Bankr. E.D.N.Y. 1981), both of which involved dismissals.

12.     The primary purpose of a Chapter 7 trustee is "to collect, liquidate and distribute estate property thereby closing the estate as expeditiously as is compatible with the best interests of the parties" (internal punctuation omitted). In re Bell, 225 F.3d 203, 221-22 (2d Cir. 2000).   While the City agrees with the Committee that continued administration of these cases in Chapter 11 may not possible in the long run in light of the exorbitant fees already incurred by the estate professionals, conversion to Chapter 7 will not avoid the imposition of several additional layers of expenses between a trustee's statutory commissions and fees and his new set of professionals and their fees.  Such additional commissions and fees, on top of the existing administrative expenses, are not sustainable by these estates if CRG's financial analysis and projected administrative insolvency prove correct.

13.     Moreover, except for their interest, if any, in the Tavern on the Green trademark and the "Le Roy Receivable" (Conversion Motion at ¶ 12), the Debtors in these cases have already collected and liquidated most of their assets.  Based on CRG's analysis of the Debtors' Financial Condition as of February 12, 2010 annexed to the Conversion Motion, some of the funds collected have already been applied to reduce TD Bank's liens, consistent with the provisions of the Auction Sale Order.  Thus, the Committee's argument that there is "continuing loss or diminution of the estate" under § 1112(b)(4)(A) is strained and should be distinguished from the estates' and/or the Committee's unbridled optimism about the value of their assets or their failure to properly value such assets at the beginning of the cases.

14.     As acknowledged by the Committee, "[t]he Debtors are currently out of business; have liquidated virtually all of their tangible assets and are not intending to reorganize"

since they "have no ability even to pay the ongoing administrative expenses of their Chapter 11 cases." (Conversion Motion at ¶ 13). Indeed, the Restaurant's operations are over and the Debtors have vacated the Restaurant's Premises. The City has no damage claims against the Debtor with respect to their vacatur of the Premises. The Debtors are no longer in the Restaurant services business and are not currently incurring any costs relating thereto or with respect to their License Agreement. Moreover, the Committee cannot claim that the Debtors have lost revenue as a result of their payment of ongoing expenses to the City under the License Agreement. As reflected in the City's Motion, the Debtors made no payments at all to the City for license fees and water and sewer charges during the post-Petition period even though they were required to do so. (See City's Motion). Therefore, there has been no diminution of assets with respect to the Restaurant business.

15. Nor can the Committee claim in good faith that the Debtors' other "assets" are diminishing in value. The Debtors' personal property, including the Tavern on the Green fine arts, chandeliers, furniture and items previously stored at the Queens warehouse, were sold at the Auction and subsequent tag sales. Thus, it cannot be said that there is any personal property that still needs to be sold and monetized. The amounts collected, while not yet reported, were, presumably, the best prices obtainable in light of the current economic conditions and were, undoubtedly, sold at fair value. The fact that the Debtors and/or the Committee might have relied on old, inflated, appraisals in the hope of raising expectations and prices, might have been misguided and, indeed, misleading to the Court and the Debtors' creditors. If the Debtors, the Committee's and even TD Bank's strategy in these cases was based on unrealistic assumptions as to the value or ease of monetizing certain assets, they alone are to be blamed, not

the City, who did precisely what any creditor is expected to do, namely, protect its properties and interests, for the benefit of every citizen and New York City taxpayer.

16. Because of the City's willingness to negotiate the Holdover Stipulation, the Debtors continued to make money from the operations of the Restaurant through January 3, 2010 (not December 31, 2009, as contended by the Committee),[2] as reflected in the sales the Debtors reported to the City. The fact that the Debtors did not make the kind of profits they anticipated and that all of their assets, including the receivables, were encumbered by the Lender's pre-Petition liens and post-Petition superpriority liens, does not mean that the Debtors did not operate profitably post-Petition -- at the City's expense. According to statements made by Mr. Desiderio to the press, the Restaurant was full during the entire holiday period and the interest generated by the Tavern's impending closure and related Auction could not have been greater. The New York Times ran a daily column raising the public's interest in the case and basically all newspapers, including the New York Law Journal, ended up running one or multiple articles on the various legal issues involved in these Chapter 11 cases, as well as the Auction.

17. For example, the Debtors listed their fine arts and chandeliers in their petition and schedules at $8 million, based, apparently on a Sotheby's appraisal. Yet, the Debtors did not use Sotheby's for the Auction, choosing instead to enlist the help of other major auction houses, including Christie's and Guernsey's. According to the Committee, despite the tremendous media attention generated for the Auction, the Auction results fell well below expectations, generating "less than one-quarter of their $8 million appraised value" (Conversion

---

[2] Since the Committee spend numerous hours insisting, in its negotiations with the City, that the operations of the Restaurant should include the New Year's Eve week, the Committee counsel should correctly remember the last date of the Restaurant operations.

Motion at ¶ 9). This, however, does not mean that the Debtors' assets "are diminishing in value" but only that the value might have been misjudged.

18.     Similarly, the Debtors' listing of the trade name in their schedule of assets for $19 million, allegedly based on an old appraisal not yet disclosed to the City, other creditors or the Court, and their frequent recitation in their papers and the press of this alleged value for the name, does not change the fact that the City never agreed with such a valuation. Moreover, the Debtors knew fully well pre-Petition that the City has asserted ownership over the trade name, as reflected in extensive 2006 correspondence between the City and trademark attorneys representing the LeRoys, including Mr. Kane's firm. The Debtors, the Committee and the Lender chose to ignore the City's 2006 letters claiming an exclusive interest in the name and using the name as "collateral". Thus, the problem is not "the City's efforts to de-value the Tavern estates in multiple ways", as argued by the Committee (see Conversion Motion at p. 5, ftn. 3) but the fact that the Debtors "overlooked" the City's 2006 letters and gallingly listed the trade name in their schedule of assets as an "undisputed" asset belonging to the Debtors' estates.

19.     The Committee now complains that the City mounted a battle over the trade name  but that issue certainly presents a fair question for resolution and the District Court has already said that much and agreed with the City's view concerning the withdrawal of reference. The Committee's insistence that any negotiation over the name must have as a starting point the Debtors' old, unsupported and hyperinflated $19 million appraisal, not even seen by the City, is mind-boggling. Equally preposterous was the suggestion that the City might be willing to pay "fees" to Streambank, the Debtors' intellectual property advisor whose retention was challenged by the City, to negotiate the use of the name, when negotiations can occur without the payment of such fees since all parties already have trademark counsel.

20.     On December 23, 2009, this Court approved the sale of the Queens warehouse to P&N Bakery LLC. Significantly, however, no report of sale has been filed by the Debtors' special real estate counsel, Craig Meltzer, Esq. and no information has been provided the City with respect to the satisfaction of its liens under the Warehouse Sale Order. That order provided that "all amounts due the City of New York for unpaid real estate taxes, water and sewer charges and real property transfer taxes in connection with the Warehouse ... shall be paid at closing with statutory interest, if any, thereon through the closing date". As set forth in the City's Limited Objection to that sale dated December 14, 2009, the City's Department of Finance had an administrative claim for real property transfer tax ("RPTT") in the amount of $92,750 and the New York City Water Board had unpaid pre- and post-Petition water and sewer charges which were first liens on the Warehouse in the approximate amount of $60,000 as of November 20, 2009, plus statutory interest accrued as of the closing date.

21.     Despite repeated inquiries to the Debtors' special real estate counsel, Craig Meltzer, Esq., and Debtors' counsel, no confirmation has been received so far by the City concerning whether the Debtors complied with the provisions of the Queens Warehouse Sale Order requiring the above-referenced payments to the City. Indeed, Mr. Meltzer's office did not return any calls or left any messages and Mr. Costa finally indicated that the closing has occurred but was not able to provide a closing statement or any other information from Mr. Meltzer or the title company showing that the payments were made and the RPTT returns were filed.[3] This is

---

[3] The Court may recall that it was the Committee that insisted on the City receiving a fixed sum without taking into account potential delays and continuing accrual of interest. In the end, as anticipated by the City, the closing was significantly delayed and ultimately took place long after the originally scheduled closing date.

unacceptable and it is this kind of inefficiency that has caused the administrative expenses in these cases to sky rocket.

22. The Warehouse Sale Order also required that "upon the closing all net proceeds as reflected by the attached Closing Statement shall be delivered directly to TD Bank, N.A. and ... shall be applied by TD Bank, N.A. to the outstanding obligations of the Debtors to TD Bank, N.A. to the extent permitted by and pursuant to the terms of that certain Debtor-in-Possession Loan and Security Agreement dated as of November 2, 2009, and such proceeds shall be free and clear of all liens, claims and encumbrances;". According to the Debtors and in light of CRG's analysis, the closing has occurred and the net proceeds of the sale to P&N Bakery LLC have already been applied to reduce TD Bank's outstanding indebtedness.

23. The City has not been apprised of what transpired at the closing and what "net proceeds" were delivered "directly to T.D. Bank, N.A." Before the Lender is permitted to further enforce its rights with respect to its Collateral and the Final DIP Order outside of this Court, the Lender should be required to disclose what proceeds from what sales it has swept and how such amounts have been allocated to the partial payment and reduction in the amount of its outstanding security interests.

24. As with the Queens Warehouse Sale, proceeds received from the Guernsey's Auction, minus certain expenses incurred in connection with the sale, as described in the Auction Sale Order[4], were supposed to be disbursed directly to TD Bank to further reduce the bank's liens. As the Court may recall, one of the City's objections in connection with the

---

[4] The Order Granting Debtors' Motion to Authorize Auction Sale By Tavern on the Green L.P. and LeRoy Adventures, Inc. as Sellers to Various Purchasers Pursuant to Section 363 of the Code dated December 31, 2009 (the "Auction Sale Order").

payment of the Auction proceeds, was transparency and the need for other creditors, including the City, to track down the amounts collected and those disbursed. At the City's insistence, the Auction Sale Order finally included the following paragraph (at page 6 thereof):

> "ORDERED that the Debtors shall provide by electronic mail to the City, the Committee, TD Bank, N.A., Equityholders, and the U.S. Trustee's Office, any reconciliation of the Sale proceeds as received by the Debtors from the Auctioneer pursuant to the Retention Application; and it is further
>
> ORDERED that the Auctioneer will follow the sale procedures as outlined in its Retention Application as follows: ...

25. In its Conversion Motion, the Committee accuses the City of "ignoring" the Debtors' current financial situation but the Debtors did not comply with the Auction Sale Order to provide the City with reconciliations received from the Auctioneer, and the Auctioneer has not yet filed its report which, under the Auction Sale Order, is its sole responsibility. Moreover, even though TD Bank also promised to provide the City with information concerning its receipt of Auction Sale Proceeds (see email correspondence annexed hereto), it too failed to provide the City with any information. Thus, the City is not aware of how the Committee calculated the amounts referred to in CRG's analysis.

26. In any event, aside from continuing to collect the premiums due from purchasers with respect to the items sold at the Auction and/or tag sales, the Debtors are no longer engaged in any activity pertaining to the sale of their assets. Except for the Debtors' alleged interest in the Tavern trademark and the collection of the Le Roy Receivable, no other assets exist that could, in theory, be monetized. With respect to the trademark, the parties simply

await Judge Cedarbaum's decision. TD Bank agrees with the City that under the Final DIP Order[5] it can only have a lien on the trade name if in fact the Debtors had an interest in the name, which it is not yet known. Thus, it is not as if TD Bank is now in a position to "monetize" the value of the trade name, if any, even if this Court were to grant its settle order lifting the automatic stay. This Court can certainly hold the proceedings in the Bankruptcy Court in abeyance until after the District Court's decision is received, which should be soon.[6]

### Even if These Chapter 11 Cases Are Converted to Chapter 7, the City's Administrative Claims, Liens, and Rights With Respect to the Letter of Credit Retain the Same Priority as In Chapter 11

27.     The timing of the Committee's Conversion Motion, the Committee's letter to the Court requesting an extension of its time to respond to the City's Motion, and its paranoid claim that the City's Code-sanctioned motion constitutes a "fresh attack on the Debtors and their estates" (see Conversion Motion at ¶ 17), all suggest that the Committee believes that if the conversion is granted, the City's administrative claims evaporate. The Committee might be wrong again.

28.     The City contends that even if these cases are converted to Chapter 7, the City's administrative claims for unpaid license fees and water and sewer charges described in the City's Motion at pp. 8-10 retain the priority they had in Chapter 11 pursuant to 11 U.S.C. §

---

[5] The Final Order Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 (I) Approving Debtors' Motion for Approval to Execute DIP Finance Agreement with TD Bank; (II) Authorizing the Use of Cash Collateral; and (III) Granting Adequate Protection to Secured Creditor TD Bank dated October 29, 2009.

[6] As the Court may be aware, the Debtors' trademark counsel already sent a letter to Judge Cedarbaum urging an expeditious decision on the matter.

348(d). Section 348 of the Bankruptcy Code dealing with the effect of conversion provides as follows in subsection (d):

> A claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112, 1208, or 1307 of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

(Emphasis added).

29.     In the City's Motion, the City relied on §§ 365(d)(3), 503(b) and 366 to request payment of its administrative claims for unpaid license fees and water and sewer charges. See City's Motion at pp. 8-10. Contrary to the statements made by the Committee in ¶ 17 of the Conversion Motion, most of the City's claims are administrative in nature. Accordingly, under § 348(d), these claims cannot be treated as pre-Petition claims. See United States v. Fowler (In re Fowler), 394 F.3d 1208 (9th Cir. 2005) (post-petition employment tax debt incurred as administrative expense in Chapter 11 retained its administrative priority after conversion to Chapter 13, by analogy to conversion to Chapter 7); see also In re Jonick Deli Corp., 263 B.R. 196 (S.D.N.Y. 2001) (reversing bankruptcy court order and holding, in an issue of first impression, that the United States Trustee's fees retained their Chapter 11 priority after conversion to Chapter 7).

30.     Even if this Court concludes that these cases should be converted to Chapter 7, this Court can direct the Chapter 7 trustee to make immediate payment of the City's administrative expenses, subject to availability of funds. See In re Dieckhaus Stationers of King of Prussia, Inc., 73 B.R. 969 (Bankr. E.D. Pa. 1987) (granting debtor's conversion motion but directing the chapter 7 trustee to make immediate  payment of the landlord's administrative

claim subject to the estate's right to recover the payment or part thereof if the debtor's assets are insufficient to pay all other administrative expense claims in full).

31. The Court has already authorized the payment of various PACA claims under Section 509(b)(9) and the Debtors have noticed for presentment for the same date as the Conversion Motion another Stipulation providing for payment of two more PACA claimants, AFI Foodservice Dist., Inc. and AFI Foodservice, LLC. There is no legal basis for favoring PACA's administrative claims over the City's administrative claims. Since this Court has authorized payment of the former, it should similarly approve payment of the latter, and if insufficient funds are available, then similarly situated creditors should receive pro-rata payments. Alternatively, the Court can direct that some of the funds received by the PACA claimants be returned to the estate so that all administrative creditors share in the proceeds on a pro-rata basis.

32. If any of the City's first liens with respect to the Queens Warehouse have not been satisfied, in violation of the Queens Warehouse Sale Order, then TD Bank should be directed to satisfy such liens from the warehouse sale proceeds received at the closing since the City's statutory liens are superior to and prime TD Bank's security interests with respect to that property.

33. Finally, the Court should be mindful of the Letter of Credit (the "L/C") discussed in the City's Motion at pp. 11-12 (point C) and the fact that the City has asked for the imposition of a constructive trust against the Debtors' estates or any party that has received the monies collected by the estates with respect to the amount of the L/C. As noted in the City's Motion, but for the Debtors' post-Petition breach of the License Agreement, the City could have received $250,000 without having to share such amount with anyone. That amount of money

was solely for the City's benefit and had been segregated pre-Petition for the exclusive purpose of curing any defaults by the Debtors under the License Agreement. Neither TD Bank, nor any of the other estate creditors, whether secured or unsecured, had the right to invade the L/C. Therefore, if the City cannot be made whole, it should, at a minimum, receive the amount of the L/C regardless of whether these cases remain in Chapter 11 or become converted to Chapter 7.

## CONCLUSION

34.     If the Court determines that the Debtors are administratively insolvent, the City supports dismissal but not conversion of their Chapter 11 cases after the Debtors, Guernsey's, Craig Meltzer and TD Bank provide the Court with their reports reflecting all proceeds received from the sale of its assets, the disbursement of such proceeds and the satisfaction and/or resolution of various claims to date.   If conversion is ordered, the City hereby seeks an provision in that order directing that its administrative expenses retain, after conversion, the same priority they had in Chapter 11, in accordance with Section 348(d) of the Bankruptcy Code and directing the Chapter 7 trustee to pay the City's administrative claims, subject only to availability of assets.   The City hereby reserves all of its rights with respect to any unsatisfied first liens under the Warehouse Sale Order and the imposition of a constructive trust with respect to the L/C, if its outstanding expenses under the License Agreement are not paid.   The City further reserves all of its rights against the Committee with respect to its unprofessional conduct in connection with the Conversion Motion.

Dated:       New York, New York
             March 3, 2010

MICHAEL A. CARDOZO
Corporation Counsel of the
City of New York
Attorney for the City of New York
100 Church Street, Room 5-223
New York, New York 10007
Tel.     (212) 788-0688
Fax:     (212) 788-0937
gcacuci@law.nyc.gov

By:       /s/Gabriela P. Cacuci
          Gabriela P. Cacuci (GC-4791)

## CERTIFICATE OF SERVICE

I, Gabriela P. Cacuci, an attorney admitted to practice before the courts of the State of New York do hereby certify that on March 3, 2010, I served true copies of the foregoing Objection of the City of New York to (I) Motion of the Official Committee of Unsecured Creditors to Convert These Chapter 11 Cases to Chapter 7 and (II) Proposed TD Bank N.A.'s Settle Order Lifting the Automatic Stay dated March 3, 2010, by facsimile and/or electronic transmission on the parties listed below:

Keith Costa, Esq.
Akerman Senterfitt LLP
335 Madison Avenue
Suite 2600
New York, New York 10017
Fax: (212) 880-8965
Keith.Costa@akerman.com

Brian Matsumoto, Esq.
Office of the United States Trustee
Southern District of New York
33 Whitehall Street, 21st Floor
New York, New York 10004
Fax: (212) 668-2255

Norman N. Kinel, Esq.
Duval & Stachenfeld, LLP
101 Park Avenue, 11th Floor
New York, New York 10178
Fax: (212) 883-8883
Email: nkinel@dsllp.com

Elizabeth J. Austin, Esq.
Pullman & Comley, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601-7006
Fax: (203) 576-8888
eaustin@pullcom.com

Edward J. Estrada, Esq.
ReedSmith LLP
599 Lexington Avenue
New York, New York 10022
Fax: (212) 521-5450
eestrada@reedsmith.com

Dated: New York, New York
      March 3, 2010                       /s/ Gabriela P. Cacuci___
                                            Gabriela P. Cacuci

**Cacuci, Gabriela**

**From:** Estrada, Edward J. [EEstrada@ReedSmith.com]
**Sent:** Wednesday, December 30, 2009 5:12 PM
**To:** Cacuci, Gabriela; keith.costa@akerman.com; nkinel@DSLLP.COM; frances.kleiner@akerman.com; Esterbrook, Scott M.; kathlyn.schwartz@akerman.com; Dumain, Rita; Friedman, Howard
**Subject:** RE: Draft sale order 12/30/09.DOC

We can provide remaining balances after receipt of weekly remittances in lieu of subsection (g) - does that work?

**From:** Cacuci, Gabriela [mailto:gcacuci@law.nyc.gov]
**Sent:** Wednesday, December 30, 2009 5:05 PM
**To:** Estrada, Edward J.; keith.costa@akerman.com; nkinel@DSLLP.COM; frances.kleiner@akerman.com; Esterbrook, Scott M.; kathlyn.schwartz@akerman.com; Dumain, Rita; Friedman, Howard
**Subject:** RE: Draft sale order 12/30/09.DOC

I wanted those provisions -
we will have the reports (hopefully) from the debtor but we would like to see how the proceeds have been applied

**From:** Estrada, Edward J. [mailto:EEstrada@ReedSmith.com]
**Sent:** Wednesday, December 30, 2009 5:01 PM
**To:** Cacuci, Gabriela; keith.costa@akerman.com; nkinel@DSLLP.COM; frances.kleiner@akerman.com; Esterbrook, Scott M.; kathlyn.schwartz@akerman.com; Dumain, Rita; Friedman, Howard
**Subject:** RE: Draft sale order 12/30/09.DOC

Gabriela - In new subsection (m) you have added the concept that a Purchaser may be liable (along with the Debtor and Auctioneer) for any damage to the premises upon removal of an item - at the least we should remove the Purchaser from that provision so as not to chill bidding on these pieces.

Additionally, your subsection (g) is superfluous reporting by the Bank - you (and all parties) will already have weekly reports from the Debtor/Auctioneer and a final Auction Report. That said, the Bank would be happy to confirm when it is paid in full.

Please let me know your position on the foregoing.

Regards, Ed

**From:** Cacuci, Gabriela [mailto:gcacuci@law.nyc.gov]
**Sent:** Wednesday, December 30, 2009 4:48 PM
**To:** keith.costa@akerman.com; nkinel@DSLLP.COM; frances.kleiner@akerman.com; Estrada, Edward J.; Esterbrook, Scott M.; kathlyn.schwartz@akerman.com; Dumain, Rita; Friedman, Howard
**Subject:** Draft sale order 12/30/09.DOC

Please find enclosed a revised sale order incorporating some of the Committee's prior comments. On behalf of the City, I'm reserving my rights to make additional comments.
Gabriela P. Cacuci
*Senior Counsel*
*Tax and Bankruptcy Litigation Division*
*New York City Law Department*
*100 Church Street, Room 5-223*
*New York, New York 10007*
*Tel. (212) 788-0688*
*Fax (212) 788-0937*
*Email: gcacuci@law.nyc.gov*

* * *

**Cacuci, Gabriela**

| | |
|---|---|
| **From:** | Norman Kinel [nkinel@DSLLP.COM] |
| **Sent:** | Wednesday, December 30, 2009 5:06 PM |
| **To:** | Cacuci, Gabriela; Estrada, Edward J.; keith.costa@akerman.com; frances.kleiner@akerman.com; Esterbrook, Scott M.; kathlyn.schwartz@akerman.com; Dumain, Rita; Friedman, Howard |
| **Subject:** | RE: Draft sale order 12/30/09.DOC |
| **Attachments:** | Norman Kinel .vcf |

The purpose here is not to add new things that you want.

**Norman N. Kinel** | Duval & Stachenfeld LLP | 101 Park Avenue 11th Floor | New York. NY 10178|
direct: 212.692.5985 | main: 212.883.1700 | fax: 212.883.8883 | nkinel@dsllp.com | http://www.dsllp.com |

**Offices in New York and California**

Note: The information in this e-mail is confidential and may be legally privileged. If you are not the intended recipient, you must not read, use or disseminate the information contained in this e-mail. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received or opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Duval & Stachenfeld LLP for any loss or damage arising in any way from its use.
To comply with IRS regulations, we advise you that any discussion of Federal tax issues in this e-mail was not intended or written to be used, and cannot be used by you, (i) to avoid any penalties imposed under the Internal Revenue Code or (ii) to promote, market or recommend to another party any transaction or matter addressed herein.

**From:** Cacuci, Gabriela [mailto:gcacuci@law.nyc.gov]
**Sent:** Wednesday, December 30, 2009 5:05 PM
**To:** Estrada, Edward J.; keith.costa@akerman.com; Norman Kinel; frances.kleiner@akerman.com; Esterbrook, Scott M.; kathlyn.schwartz@akerman.com; Dumain, Rita; Friedman, Howard
**Subject:** RE: Draft sale order 12/30/09.DOC

I wanted those provisions -
we will have the reports (hopefully) from the debtor but we would like to see how the proceeds have been applied

**From:** Estrada, Edward J. [mailto:EEstrada@ReedSmith.com]
**Sent:** Wednesday, December 30, 2009 5:01 PM
**To:** Cacuci, Gabriela; keith.costa@akerman.com; nkinel@DSLLP.COM; frances.kleiner@akerman.com; Esterbrook, Scott M.; kathlyn.schwartz@akerman.com; Dumain, Rita; Friedman, Howard
**Subject:** RE: Draft sale order 12/30/09.DOC

Gabriela - In new subsection (m) you have added the concept that a Purchaser may be liable (along with the Debtor and Auctioneer) for any damage to the premises upon removal of an item - at the least we should remove the Purchaser from that provision so as not to chill bidding on these pieces.

Additionally, your subsection (g) is superfluous reporting by the Bank - you (and all parties) will already have weekly reports from the Debtor/Auctioneer and a final Auction Report. That said, the Bank would be happy to confirm when it is paid in full.

Please let me know your position on the foregoing.

Regards, Ed

**From:** Cacuci, Gabriela [mailto:gcacuci@law.nyc.gov]
**Sent:** Wednesday, December 30, 2009 4:48 PM
**To:** keith.costa@akerman.com; nkinel@DSLLP.COM; frances.kleiner@akerman.com; Estrada, Edward J.; Esterbrook, Scott M.; kathlyn.schwartz@akerman.com; Dumain, Rita; Friedman, Howard
**Subject:** Draft sale order 12/30/09.DOC

Please find enclosed a revised sale order incorporating some of the Committee's prior comments. On behalf of the City, I'm

reserving my rights to make additional comments.
Gabriela P. Cacuci
*Senior Counsel*
*Tax and Bankruptcy Litigation Division*
*New York City Law Department*
*100 Church Street, Room 5-223*
*New York, New York 10007*
*Tel. (212) 788-0688*
*Fax (212) 788-0937*
*Email: gcacuci@law.nyc.gov*

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.
* * *
To ensure compliance with Treasury Department regulations, we inform you that, unless otherwise indicated in writing, any U.S. Federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or applicable state and local provisions or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

Disclaimer Version RS US 1 01 03
pdcf

3/3/2010