# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

In re:                                                    Chapter 7

TAVERN ON THE GREEN LIMITED                               09-15450 (ALG)
PARTNERSHIP and LEROY ADVENTURES,                         09-15448 (ALG)
INC.,
                                                          (Jointly Administered)

                                    Debtors.

---------------------------------------------------------------X

## STIPULATION RESOLVING DISPUTES BETWEEN TAVERN ON THE GREEN LIMITED PARTNERSHIP AND LEROY ADVENTURES, INC. AND THE CITY OF NEW YORK AND THE NEW YORK CITY DEPARTMENT OF PARKS AND RECREATION

This Stipulation is entered into on this 15th day of April, 2011, by and between the City

of New York, the New York City Department of Parks and Recreation (collectively, the "**City**")

and Jil Mazer-Marino, in her capacity as Chapter 7 Trustee for the jointly administered chapter 7

estates (the "**Estate**") of Tavern on the Green Limited Partnership ("**TOG**") and LeRoy

Adventures, Inc. ("**LeRoy**," and together with TOG, the "**Debtors**").

WHEREAS, on or about May 12, 1981, TOG's predecessor registered the trademark

"Tavern on the Green" for "Restaurant Services" (Registration No. 1,154,270) with the United

States Patent & Trademark Office (the "**Restaurant Mark**");

WHEREAS, on or about April 11, 2007, TOG filed an application with the United States

Patent & Trademark Office to register the name "Tavern on the Green" for "Oils for cooking and

for food, namely, flavored oils, dipping oils" and "Salad dressings; condiments, namely sauces,

dipping sauces" for which the United States Patent & Trademark Office issued a registration

(Registration No. 3,494,658) on September 2, 2008 (the "**Oil and Dressing Mark**");

WHEREAS, on September 9, 2009, the Debtors filed voluntary petitions for

reorganization with the Bankruptcy Court for the Southern District of New York (the

1

"**Bankruptcy Court**") pursuant to Chapter 11 of the Bankruptcy Code (Case No. 09-15450 (ALG) and Case No. 09-15448 (ALG));

WHEREAS, on October 21, 2009, the City commenced an adversary proceeding (the "**City's Adversary Proceeding**"), against the Debtors (Adv. Pro. No. 09-01538) which contained four claims for relief:

A. Claim One: for a declaratory judgment that the City is the exclusive owner of the Restaurant Mark and Oil and Dressing Mark;

B. Claims Two through Four: to cancel the Restaurant Mark and the Oil and Dressing Mark or, alternatively, to require TOG to assign the Restaurant Mark and Oil and Dressing Mark to the City;

WHEREAS, on October 21, 2009, the Debtors commenced an adversary proceeding (the "**Debtors' Adversary Proceeding**," and together with the City's Adversary Proceeding, the "**Adversary Proceedings**"), against the City (Adv. Pro. No. 09-01540), seeking, inter alia, a declaratory judgment that the Debtors are the exclusive owners of the Restaurant Mark;

WHEREAS, on November 6, 2009, the City moved the United States District Court for the Southern District of New York to withdraw the reference to the Bankruptcy Court of the Adversary Proceedings;

WHEREAS, the City's and Debtors' Adversary Proceedings were assigned civil court docket numbers 09 CIV 9224 and 09 CIV 9254, respectively (each, a "**District Court Case**" and collectively, the "**District Court Cases**");

WHEREAS, on December 4, 2009, the United States District Court for the Southern District of New York withdrew the reference to the Bankruptcy Court of the Adversary Proceedings;

WHEREAS, the City and the Debtors each moved for summary judgment in its respective District Court Cases;

2

WHEREAS, on March 10, 2010, the Honorable Miriam Goldman Cedarbaum issued an opinion (the "**Opinion**"): (a) denying the Debtors' motion for summary judgment; (b) granting the City's motion to the extent that the City sought a declaration that it has the right, under New York law, to use the name "Tavern on the Green" for its historic restaurant in Central Park, New York; and (c) directing the cancellation of the Restaurant Mark issued to TOG's predecessor;

WHEREAS, on March 10, 2010, the Bankruptcy Court converted the Debtors' Chapter 11 bankruptcy cases to Chapter 7 bankruptcy cases;

WHEREAS, on March 11, 2010, Jil Mazer-Marino (the "**Trustee**"), was appointed as interim Chapter 7 Trustee for the Estate and on May 28, 2010, at a duly convened meeting pursuant to Bankruptcy Code section 341, qualified as permanent trustee of the Estate pursuant to Bankruptcy Code section 702(d);

WHEREAS, by order dated April 8, 2010 (the "**April 8 Order**") and entered on the dockets of each of the District Court Cases on April 9, 2010, Judge Cedarbaum amended her Opinion, at the request of the Trustee, on behalf of the Estate, and the City and, in accordance with a stipulation entered into by the parties, such that the provision in the Opinion directing cancellation of the Restaurant Mark was deleted, and the Court directed that the Restaurant Mark and any good will appurtenant thereto be assigned from the Estate to the City subject to the rights of the parties to appeal all aspects of the April 8 Order and further ordered that, pending the outcome of the Appeal, that the City and the Trustee, on behalf of the Estate, shall not take any action or intended action to:

A.  sell, exchange, barter, assign, transfer, give, or otherwise dispose of the Restaurant Mark;

B.  pledge, escrow, hypothecate, mortgage, grant or create a security interest in or lien upon the Restaurant Mark; or

3

C. transfer any interest in the trademark, including, without limitation, any licensing rights to the Restaurant Mark, except: (i) to the extent set forth in a writing signed by the City and the Trustee; and (ii) the City and its concessionaires may continue to use the name "Tavern on the Green" as the name of its historic restaurant in Central Park, New York;

WHEREAS, the Court's Final Judgment awarding the aforesaid relief was entered on the docket of each of the District Court Cases on April 9, 2010;

WHEREAS, on May 5, 2010, the Trustee filed Notices of Appeal in the District Court Cases with the United States Court of Appeals for the Second Circuit and received Docket Number 10-1796 in regard to *City of New York v. Jil Mazer-Marino as Interim Chapter 7 Trustee for Tavern on the Green, L.P. and Leroy Adventures, Inc.* and Docket Number 10-1802 in regard to *Jil Mazer-Marino as Interim Chapter 7 Trustee for Tavern on the Green, L.P. and Leroy Adventures, Inc. v. New York City Department of Parks & Recreation* (collectively, the "**Appeals**," and together the Adversary Proceedings, District Court Cases, and Appeals are the "**Litigation**");

WHEREAS, on May 19, 2010, the Trustee filed a Motion to Consolidate on the dockets of each of the Appeals, which motion was granted under Docket Number 10-1796 on May 26, 2010;

WHEREAS, on May 20, 2010, an order was entered by the Bankruptcy Court authorizing the Trustee to retain Streambank, LLC to provide marketing, disposition and other services in connection with the Restaurant Mark, Oil and Dressing Mark and other intellectual property;

WHEREAS, TD Bank, N.A. has a first priority perfected lien on and security interest in all of the Estate's assets, including without limitation, a lien on and security interest in the Estate's interest in and to the Restaurant Mark and the Oil and Dressing Mark ("**TD Bank's Lien**");

4

WHEREAS, as of the date hereof, TD Bank, N.A. asserts claims against the Estate, which as of March 11, 2010, were in the aggregate amount of approximately $2.4 million (the "**TD Bank Claim**");

WHEREAS, on August 11, 2010, the Trustee and the City entered into and filed a Stipulation withdrawing the Appeals without prejudice and without costs, subject to being reinstated upon filing written notice by May 16, 2011; and

WHEREAS, the Trustee and the City have reached agreement on the terms of a proposed Use Agreement regarding the use of the Restaurant Mark, the Product Marks, the Concurrent User's Marks, and the Oil and Dressing Mark (collectively, the "**Marks**"), as defined and as provided in the Use Agreement, a copy of which is annexed hereto as Exhibit "A" (the "**Use Agreement**"); and

WHEREAS, the Trustee, the City and TD Bank, N.A. have conferred and have engaged in arms-length negotiations and desire to resolve the Litigation and related disputes.

NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED AS FOLLOWS:

1.      This Stipulation is subject to entry of an order by the Bankruptcy Court on the docket of the TOG's chapter 7 case, Case No. 09-15450 (consistent with the Bankruptcy Court Order dated September 22, 2009 directing that the docket in Case No. 09-15450 be consulted for all matters affecting the Debtors) approving this Stipulation (the "**Approval Order**"). In the event that an Approval Order is not obtained, this Stipulation shall be void *ab initio* and the Trustee shall have the right to reinstate the Appeals.

2.      This Stipulation shall be effective on the date that the Approval Order becomes a Final Order (the "**Effective Date**"). For purposes of this Stipulation, the term Final Order shall mean an order, ruling, or judgment, the operation or effect of a judgment or other

782830v.28
775232

decree issued and entered by the Bankruptcy Court that has not been reversed, vacated, stayed, modified or amended and as to which (i) the time to appeal or petition for review, rehearing, certiorari, reargument or retrial has expired and as to which no appeal or petition for review, rehearing, certiorari, reargument or retrial is pending or (ii) any appeal or petition for review, rehearing, certiorari, reargument or retrial has been finally decided and no further appeal or petition for review, rehearing, certiorari, reargument or retrial can be taken or granted.

3.     Unless transferred sooner, promptly after the Effective Date, the Trustee, on behalf of the Estate, shall execute the assignment attached hereto as Exhibit B transferring ownership of the Restaurant Registration to the City, and shall also transfer ownership of the domain names and URLs, www.tavernonthegreen.com and www.tavernonthegreen.net, to the City.

4.     The Trustee acknowledges that as of the Effective Date, neither the Trustee nor the Estate has or will have any ownership or other rights of any kind in the Restaurant Mark or in any domain names and URLs using the name "Tavern on the Green", except as provided in the Use Agreement.  With respect to the Oil and Dressing Mark, any actions of the Trustee or the Estate shall be taken only to the extent permitted in the Use Agreement, subject to the terms, rights, limitations and obligations set forth in the Use Agreement.

5.     The Trustee intends to conduct an auction sale of the Use Agreement and ownership of the Oil and Dressing Mark (the "**Rights Sale**").  Such Rights Sale shall be only in whole and not in part, *i.e.*, there shall only be one concurrent user (the "**Concurrent User**") at any given time under the terms of the Use Agreement.  Such Rights Sale shall dispose of all

rights under the Use Agreement and in and to the Oil and Dressing Mark to a single purchaser, and the use/sublicensing of the Marks shall be subject to the terms of the Use Agreement.

6. Upon the Effective Date and through and including such date that the Use Agreement is fully executed and delivered by the City and Concurrent User, if any, the City may exercise all rights in and to the Restaurant Mark, except as limited by the Use Agreement.

7. Upon the Effective Date, the Estate shall be deemed to own the Oil and Dressing Mark and shall be fully vested with all rights in and to the Oil and Dressing Mark, subject to the terms of this Stipulation and the terms of the Use Agreement, whether the Use Agreement is executed or not.

8. Upon the Effective Date, TD Bank's Lien shall be of no further force and effect with respect to the City's ownership and use of the Restaurant Mark. TD Bank's Lien shall continue, in full force and effect, in and to the Estate's interests in the Use Agreement, the Oil and Dressing Mark, the Concurrent User's Marks, and the Product Marks and any proceeds of the Rights Sale.

9. Promptly after the Effective Date, the Trustee shall file appropriate notices to discontinue the Appeals with prejudice and without costs, and the City and Trustee shall present to Judge Cedarbaum for her consideration, a stipulation dismissing the remaining claims in the District Court Cases with prejudice and without costs.

10. The City acknowledges that the Use Agreement and the Oil and Dressing Mark are fully transferrable by the Estate pursuant to Bankruptcy Code sections 105, 363 and 365 and the Trustee has sole authority to sell the Use Agreement and the Oil and Dressing Mark, subject to the provisions of Paragraph 12 below.

11.     Neither the City nor the Trustee has the right to modify or to change any of the terms of the Use Agreement and neither the City nor the Trustee has the power to bind each other to any agreement pertaining to the use or ownership of the Marks except as provided in the Use Agreement.

12.     Notwithstanding anything herein:

(a)     The Trustee agrees that, absent the City's prior written consent, the Use Agreement shall not be sold to a third party unless the consideration for such Use Agreement equals or exceeds $500,000.00 (the "**Minimum Bid Price**"). If the Minimum Bid Price is not obtained prior to the Sale Deadline (as defined below) and the City does not provide the Trustee with prior written consent to sell Use Agreement for less than the Minimum Bid Price, the Use Agreement shall cease to have any force or effect; provided, however, the Estate shall retain all rights to the Oil and Dressing Mark subject to the terms and provisions of the Use Agreement whether executed or not and TD Bank's Lien in the Estate's interest in the Oil and Dressing Mark.

(b)     The Trustee agrees that the last date for the Trustee to seek Bankruptcy Court approval of a sale of the Use Agreement is the date that is nine (9) months after the Effective Date or such later date as the City may agree to in writing (the "**Sale Deadline**"). If the Trustee does not seek Bankruptcy Court approval of a sale of the Use Agreement on or before the Sale Deadline, which approval is subsequently granted by the Bankruptcy Court, the Use Agreement shall cease to have any force or effect; provided, however, the Estate shall retain all rights to the Oil and Dressing Mark subject to the terms and provisions of the Use Agreement whether executed or not and TD Bank's Lien in the Estate's interest in the Oil and Dressing Mark.

13.     Within twenty (20) days of receipt of a Use Agreement executed by the Concurrent User, the City shall execute and deliver a fully executed Use Agreement to the Concurrent User with a copy to the Trustee.

14.     All Net Proceeds (defined below) from the Rights Sale shall be deposited into the separate segregated account set up by the Trustee for such purpose and distributed as follows:

(a)    The first Net Proceeds shall be distributed to TD Bank, N.A. until the TD Bank Claim (to the extent it is an allowed secured claim against the Estate, following application on notice to creditors, including the City, by TD Bank, N.A. for allowance of such Claim) is paid in full. All Net Proceeds from the Rights Sale shall be subject to TD Bank's Lien until such time as the TD Bank Claim is paid in full.

(b)    The remaining Net Proceeds shall be divided between the City and the Estate. The Trustee shall retain seventy five percent (75%) of Net Proceeds for the Estate (for distribution pursuant to the priorities established in Bankruptcy Code section 706). The remaining 25% shall be distributed by the Trustee to the City.

15.    For purposes of this Stipulation, Net Proceeds shall mean the total gross consideration paid to the Estate from any Rights Sale, less the reasonable and customary costs of sale, including commissions and expenses of Streambank, LLC pursuant to the Retention Agreement approved by the Bankruptcy Court in its order dated May 20, 2010, applicable taxes, if any, and break-up fees, expense reimbursements or other bidder protections as approved by the Bankruptcy Court and subject to TD Bank's approval, which approval shall not be unreasonably withheld, and the Trustee's commissions and reasonable attorneys' fees incurred in connection with the Rights Sale.

16.    The City agrees that the Trustee may use images of Central Park, New York, and the Central Park Location, and may make reference to the historic operations of the restaurant Tavern on the Green; provided such images and references are used solely by the Trustee and parties retained by the Trustee to market the Use Agreement and such uses are consistent with the terms of the Use Agreement.

17.    The parties shall assist each other by taking any steps reasonably necessary to effectuate the intent of this Stipulation in all respects; provided that the Estate shall not be required to take any action resulting in material costs to the Estate.

782830v.28

18.     The undersigned persons each represent that they are authorized to execute this Stipulation on behalf of the respective clients.

19.     This Stipulation may be executed in counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same.

20.     This Stipulation shall be binding upon and inure to the benefit of the parties' respective assigns and successors, including trustees and receivers.  This Stipulation may be signed and transmitted by facsimile or emailed pdf, which shall be deemed to have the full force and effect of original ink signatures.

21.     Nothing herein is intended to nor shall it be construed to limit, modify or otherwise amend any of TD Bank's and the Estate's relative rights, remedies, powers, or obligations vis á vis each other, including any rights or remedies TD Bank may have with respect to the Estate's interests in the Marks under applicable law (including the Bankruptcy Code), any Bankruptcy Court order or the loan documents between TD Bank and the Debtors.

22.     Except for the obligations hereunder and under the Use Agreement, the City, on the one hand and the Trustee on behalf of herself and the Estate on the other hand, mutually release and discharge each other, and their respective officers, directors, representatives and agents from liability for any and all claims that each may otherwise have or had against the other arising out of or in connection with the Marks.

23.     Except for the obligations hereunder, the City, on the one hand and TD Bank on the other hand, mutually release and discharge each other, and their respective officers,

directors, representatives and agents from liability for any and all claims that each may otherwise have or had against the other arising out of or in connection with the Marks.

Dated  Garden City, New York
      April 15, 2011

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.



By:___/s/ Alan E. Marder_____
     Alan E. Marder, Esq.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, NY 11530-9194
(516) 741-6565

*Attorneys for Jil Mazer-Marino, Esq., the*
*Chapter 7 Trustee for Tavern on the Green*
*Limited Partnership and Leroy Adventures, Inc.*

Dated  New York, New York
      April 15, 2011

TD BANK, N.A.


By:___/s/George Guarino_____
     Name:George Guarino
     Title: Vice President, Asset Recovery Group
1701 Rt. 70 East
Cherry Hill, NJ 08034
(856) 874-2484

Dated  New York, New York
      April 15, 2011

MICHAEL A. CARDOZO
CORPORATION COUNSEL FOR THE CITY
OF NEW YORK



By:___/s/ Gerald E. Singleton_____
     Gerald Singleton, Esq.
100 Church Street
Room 20-093
New York, NY 10007
(212) 788-0760

*Attorneys for the City of New York and New York*
*City Department of Parks and Recreation*




SO ORDERED this __
day of _____, 2011


_____
UNITED STATES BANKRUPTCY JUDGE

11

782830v.28

# EXHIBIT A
## USE AGREEMENT

## USE AGREEMENT

This USE AGREEMENT (the "Agreement") is entered into as of _____ __, 2011 (the "Effective Date"), by and between the City of New York, by and through its Department of Parks and Recreation (the "City"), and _____ (the "Concurrent User"). The City and the Concurrent User are each a "Party" and together the "Parties."

WHEREAS, the City owns and operates (directly or through concession or other arrangement) a facility called "Tavern on the Green" in Central Park in the City of New York and, directly and through agreements with third parties, has operated and intends to continue to operate a restaurant and/or other amenities at this location under the name "Tavern on the Green";

WHEREAS, Tavern on the Green Limited Partnership, a New York limited partnership ("TOG") or LeRoy Adventures, Inc., a New York corporation ("LeRoy") and their predecessors and affiliates operated the restaurant known as "Tavern on the Green" as a concessionaire of the City at the Central Park location from approximately 1976 until December 31, 2009;

WHEREAS, the predecessor to TOG applied for and obtained United States trademark and service mark registrations for TAVERN ON THE GREEN for "restaurant services," U.S. Registration No. 1,154,270, issued May 12, 1981 and for "oils for cooking and for food, namely, flavored oils, dipping oils" and "salad dressings; condiments, namely sauces, dipping sauces;" U.S. Registration No. 3,494,658, issued September 2, 2008;

WHEREAS, Jil Mazer-Marino is the Chapter 7 Trustee (the "Trustee") of the Chapter 7 estates (the "Estate") of TOG and LeRoy;

WHEREAS, the City and the Trustee have resolved their disputes concerning ownership and use of the name "Tavern on the Green" at the Central Park location and for products and services elsewhere, and such resolution is memorialized in a "Stipulation Resolving Disputes Between Tavern On The Green Limited Partnership and Leroy Adventures, Inc. and The City of New York and The New York City Department of Parks and Recreation" (the "Stipulation") filed with the U.S. Bankruptcy Court for the Southern District of New York on _____ __, 2011;

WHEREAS, the Trustee, in furtherance of her fiduciary duties to the Estate, has sold to Concurrent User the right to register and use the Concurrent User's Marks and Product Marks (as defined below) and ownership of the Oil and Dressing Registration and Mark (as defined below), pursuant to and subject to the terms and conditions of this Agreement; and

WHEREAS, consistent with the resolution of the disputes between the City and the Trustee, the City wishes to enter into this Agreement with Concurrent User, and Concurrent User wishes to enter into this Agreement with the City.

NOW, THEREFORE, in consideration of the promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the terms set forth herein.

# 1.   **Definitions**

1.01   "Acceptable Level of Quality" is defined in Section 10.

1.02   "Central Park Location" means a structure in Central Park, New York, historically operated as the "Tavern On The Green" restaurant.

1.03   "Central Park Goods" means any and all souvenir items (including without limitation t-shirts, post cards, key chains, coffee mugs, plates, dishes and other similar items) bearing the Mark and offered directly or indirectly by the City, its agents, or its concessionaires at the Central Park Location or at a City Retail Outlet, *i.e.*, an outlet operated by the City or its agents.

1.04   "Central Park Services" means restaurant, bar, visitor center, and any food, beverage or other service offered directly or indirectly by the City at the Central Park Location.

1.05   "City" means the City of New York, its assigns, licensees, vendors, contractors, agents and/or concessionaires and any other person or entity authorized to act on the City's behalf.

1.06   "City Retail Outlet" means a retail outlet operated by the City.

1.07   "Concurrent User" means the Concurrent User named above or any successor or assignee of such party under Section 8 of this Agreement.

1.08   "Concurrent User's Marks" means the Mark when such words are combined with and accompanied by differentiating language in the nature of a geographic or location identifier as set forth in Section 2.04(b) and used for restaurant, bar and catering services.

1.09   "Current Logo" means the Tavern on the Green stylized design annexed hereto as Exhibit A.

1.10   "Mark" means "Tavern on the Green."

1.11   "Oil and Dressing Registration and Mark" means the U.S. Patent and Trademark Office registration for "Tavern on the Green" for "oils for cooking and for food, namely, flavored oils, dipping oils" and "salad dressings; condiments, namely sauces, dipping sauces" under Registration No. 3,494,658, issued September 2, 2008.

1.12   "Product Marks" means "Tavern on the Green" for any goods.

1.13   "Product Mark Registrations" means any registration for "Tavern on the Green" or the Current Logo for goods.

1.14   "Product Mark Registration Period" means the seven (7) year period following the earlier of the Effective Date of this Agreement or six (6) months after the Effective Date of the Stipulation.

1.15 "Product Restricted Area" means the City of New York, the counties of Nassau, Suffolk, Westchester and Rockland in the State of New York and the counties of Bergen, Essex, Union, Middlesex and Monmouth in the State of New Jersey.

1.16 "Restaurant Mark" means "Tavern on the Green" for restaurant services.

1.17 "Restaurant Registration" means the U.S. Patent and Trademark Office registration for "Tavern on the Green" for "restaurant services," under U.S. Registration No. 1,154,270, issued May 12, 1981.

1.18 "Restaurant Restricted Area" means the States of New York, New Jersey, and Connecticut and the portion of Pennsylvania detailed in Exhibit B.

## 2. The Restaurant Mark and the Concurrent User's Marks

2.01 The City owns the Restaurant Registration and the Restaurant Mark and all associated goodwill, and retains and possesses the rights to (a) use and register the Restaurant Mark, (b) operate a restaurant and any other facility offering Central Park Services or any other City services using the Mark at the Central Park Location, (c) operate restaurants using the Mark at other locations within the five boroughs of the City, and (d) use and register the Mark for all City services or Central Park Services provided at the Central Park Location. So long as this Agreement remains in effect, the City shall not use or authorize others to use the Restaurant Mark and the Current Logo for restaurant services outside the five boroughs of the City and, as set forth in Section 2.04, the Concurrent User shall use the Restaurant Mark and Logo only outside of the Restaurant Restricted Area.

2.02 The City owns and shall be entitled to register the Current Logo for restaurant services, catering services and bar services and for all Central Park Services.

2.03 The Concurrent User shall assist the City by taking any steps necessary to effectuate the transfer of ownership of the Restaurant Registration to the City or to effectuate the intent of this Agreement with respect to ownership and use of the Mark at the Central Park Location for the Central Park Services or any other City services.

2.04 The City and the Concurrent User agree that the City shall not object to the Concurrent User's use of the Concurrent User's Marks and the Current Logo for restaurant services, provided such use conforms to the following limitations:

(a) The Concurrent User shall use the Concurrent User's Marks and Current Logo only outside of the Restaurant Restricted Area.

(b) The Concurrent User, when using the Concurrent User's Marks, shall (i) include differentiating language in the name of the establishment in the nature of a geographic or location identifier as a prefix or suffix set off by a hyphen, colon, "@" sign or the words "at" or "in" (e.g., "Tavern on the Green – Los Angeles"), and (ii) as required in Exhibit C, use clear and prominent disclaimers as follows: "Not affiliated with Tavern on the Green in Central Park in New York City".

(c)     No use of the Concurrent User's Mark and Current Logo by the Concurrent User shall mention Central Park, or feature any pictures or other depictions of Central Park or any Central Park structures, including pictures or other depictions of the Central Park Location or any other City trade or service marks, in conjunction with use of the Mark by the Concurrent User, without the prior written consent of the City; provided, however, that the Concurrent User is permitted to use the images annexed hereto as Exhibit D and substantially similar images of the interior of the Central Park Location as operated by TOG and LeRoy from 1976 to 2009. For the avoidance of doubt, the Parties acknowledge that the Concurrent User shall have the right to use any and all elements of the décor associated with the restaurant operated by TOG and LeRoy at the Central Park Location from 1976 to 2009, including without limitation light fixtures, furniture styles, window treatments, floor coverings, wall coverings, murals, woodwork, table settings, service items, accessories, and related items.

(d)     The Concurrent User shall use the Concurrent User's Marks and Current Logo solely to operate restaurants, bar services and catering operations for dining of a high quality with regard to food quality, cleanliness, food handling and preparation and compliance with any and all laws, rules and regulations regarding such services. Restaurants using the Concurrent User's Mark will be full-service restaurants, featuring host/hostess and table service, high-quality made-to-order food and distinctive décor; buffet service may also be offered. For the avoidance of doubt, fast food, drive-through and cafeteria style eating establishments are specifically prohibited; provided, however, that high quality, gourmet-style take-out and mobile service (i.e., "food truck" and food cart) establishments will be permitted, and may offer high quality, gourmet-style pre-packaged prepared foods.

(e)     The Concurrent User agrees not to challenge the City's use and registration of the Restaurant Mark and Current Logo or its use or registration of the Mark for Central Park Services or other City services.

(f)     The Concurrent User shall not attempt to register the Restaurant Mark or the Current Logo for restaurant services or other Central Park Services; provided, however, that the City shall not object to or file any opposition to an application by the Concurrent User for a United States or foreign trademark registration for a Concurrent User's Mark; and provided, further, that the City shall not seek to cancel any registration resulting therefrom other than as set forth in Section 12.02. Any and all costs and expenses associated with the filing and prosecution of such applications, the maintenance of any ensuing registrations, and any enforcement of or against such registrations, shall be at the Concurrent User's sole cost and expense, and the City shall be promptly reimbursed by the Concurrent User for any costs incurred by the City in relation thereto, including reasonable compensation for the time of any City employee in connection therewith. As long as this Agreement is in effect, the City may not file an application to have the Restaurant Mark or Current Logo registered for restaurant services outside the United States (a "Foreign Registration").

(g)     The Concurrent User shall use the Concurrent User's Marks and Current Logo only in connection with permitted services, as set forth in Section 2.04(d) above, and shall not use the Concurrent User's Marks and Current Logo in connection with any illegal services, topless or "strip" clubs, pornography, tobacco (provided, that Concurrent User's establishments may allow smoking consistent with local laws and regulations), pyrotechnics, and other

categories that in the reasonable judgment of the City are objectionable and will diminish the goodwill associated with the Restaurant Mark, and which are identified by the City and which the Concurrent User is provided reasonable written notice.

(h)    The parties acknowledge that the City intends to continue to sell food and food products at the Central Park Location under the Restaurant Mark (whether directly or indirectly), but nothing herein shall require the City to continue to use the Restaurant Mark at the Central Park Location and its failure to do so shall not affect the validity of its rights in the Restaurant Mark.

## 3.    **Product Marks**

3.01    The Concurrent User owns the Oil and Dressing Registration and Mark and associated goodwill and possesses the right to use and register such mark in the United States, subject to the rights granted to the City and subject to all of the restrictions and limitations contained in this Agreement.

3.02    The City agrees not to challenge the Concurrent User's (a) use and registration of the Oil and Dressing Mark, (b) Product Mark Registrations issued to Concurrent User during the Product Mark Registration Period and (c) use of the Product Marks registered pursuant to such Product Mark Registrations provided such use is in compliance with the terms and conditions of this Agreement.

3.03    During the Product Mark Registration Period, (a) the Concurrent User has the exclusive right to apply to register the Mark and the Current Logo for products and services for which the Concurrent User has the bona fide intention to use the Mark in the United States, so long as such products and services are reasonably related to restaurant and catering operations, food, food preparation and food service items, home furnishings, décor, apparel and accessories, and (b) the City shall be prohibited from using the Mark and the Current Logo for products other than Central Park Goods, Services or City services.    At the conclusion of the Product Mark Registration Period, the Concurrent User shall retain ownership of all Product Mark Registrations issued to the Concurrent User during the Product Mark Registration Period for the term of any such registrations, including all renewals and extensions, and shall own and have the exclusive right to use such Product Marks.    After the Product Mark Registration Period, Concurrent User shall withdraw any pending applications for which no registration has issued, and the City shall have the right to register Product Marks and the Current Logo for any goods and services where no Product Mark Registration was issued during the Product Mark Registration Period.

3.04    Use of the Product Marks, the Current Logo and the Oil and Dressing Mark by the Concurrent User shall be subject to the following limitations:

(a)    All uses of the Product Marks or Oil and Dressing Mark on products, packaging, advertising, and promotional materials shall be accompanied by clear and prominent disclaimers as specified in Exhibit C, stating: "Not affiliated with Tavern on the Green in Central Park in New York City."

(b)    Products, their packaging, advertisement and displays to which the Mark is applied by the Concurrent User shall not mention Central Park, nor feature any pictures or other depictions of Central Park or Central Park structures, including the Central Park Location or any other City trade or service mark, without the prior written consent of the City; provided, however, that the Concurrent User is permitted to use the images annexed hereto as Exhibit D, and other substantially similar images of the interior of the Central Park Location.

(c)    The Concurrent User shall not sell or allow to be sold products bearing the Mark in retail stores physically located in the Product Restricted Area, without the prior written consent of the City to be granted or withheld in the City's sole and absolute discretion.  In the event that the City consents to sales of products bearing the Mark within the Product Restricted Area, the City shall be entitled to receive a royalty for such sales as follows: (i) if such sale is made by a licensee of Concurrent User, twenty percent (20%) of any royalties received by Concurrent User attributable to such sales, and (ii) if such sale is made directly by the Concurrent User, four percent (4%) of all gross revenue attributable to such sales.  Such sales shall be subject to the audit provisions set forth in Exhibit F hereto.

Concurrent User agrees to use the Product Mark and Current Logo only in connection with legal goods and services and not be in connection with pornography, tobacco, pyrotechnics, and other categories that in the reasonable judgment of the City are objectionable and will diminish the goodwill associated with the Mark, and which are identified by the City and for which the Concurrent User is provided reasonable written notice.

Notwithstanding anything contrary in this Agreement, Concurrent User shall be permitted to sell off, and sublicense the right to sell-off, the current stock of salad dressings, oils and marinades bearing the Product Mark (including inventory and goods to be finished from ingredients, components and work-in-process in current stock) outside the Product Restricted Area.  At execution, the Concurrent User shall provide the City with a notarized inventory of all current stock of salad dressings, oils and marinades bearing the Product Mark (including inventory and goods to be finished from ingredients, components and work-in-process in current stock).  Inventory and sell off of all such items shall be subject to the audit provisions contained in Exhibit F hereto.

3.05    Notwithstanding anything contrary in this Agreement, the City shall be permitted to produce Central Park Goods solely for sale at the Central Park Location and at any City Retail Outlet.  The Central Park Goods shall not include any food products, cooking utensils, or tabletop products (e.g., eating utensils, table linens, and placemats), but does include souvenir mugs, cups, glasses, plates, dishes, spoons and similar souvenir items.

3.06    To the extent necessary to permit the City to produce and sell such Central Park Goods, Concurrent User hereby grants to the City a perpetual, irrevocable, transferable, sublicensable, royalty-free license under any Product Mark Registrations and any common-law rights to Product Marks or the Current Logo used and/or registered by the Concurrent User.

## 4.    **Territory**

4.01    The territory of this Agreement shall be the United States.

**5.** **Logos and Internet Domain Names**

5.01    Either Party, at any time, in its sole and absolute discretion, may elect to develop and utilize its own exclusive logo consistent with the other terms and conditions of this Agreement so long as such logos or marks are otherwise consistent with the terms and intent of this Agreement and would not otherwise infringe on the rights of the other Party or cause confusion, mistake or deception on the part of consumers.

5.02    The City shall own and have exclusive right to use the internet domain names or URLs www.tavernonthegreen.com and www.tavernonthegreen.net and any other URLs consisting of "Tavern on the Green" alone with any other TLD extension.  Concurrent User may register and use other domain names utilizing "Tavern on the Green" in connection with uses permitted under this Agreement provided that the domain name include language differentiating the domain names from www.tavernonthegreen.com and www.tavernonthegreen.net (e.g., www.tavernonthegreenbrands.com or www.tavernonthegreen-LA.com).

**6.** **Avoidance of Confusion**

6.01    The Parties agree to cooperate and consult with each other in good faith if future conditions or developments suggest to either the possibility that the Parties' respective use of the Restaurant Mark or the Concurrent User's Marks or the Product Marks is likely to result in confusion or dilution, all with the view to insuring that no substantial likelihood of confusion or dilution between the Parties' use of the said marks, as they are actually used, shall occur.

**7.** **Licenses Issued by the Concurrent User and the City**

7.01    The Concurrent User and the City shall each require and include provisions that are consistent with and reflect the terms of this Agreement in any license or sublicense agreements pertaining to the use of the Restaurant Mark, the Concurrent User's Marks, the Current Logo, or the Product Marks as permitted by this Agreement.

7.02    In the event that a licensee or sublicensee of the Concurrent User violates the provisions of its license or sublicense that reflect the terms of this Agreement, the Concurrent User shall cause such licensee or sublicensee promptly to comply with such provisions:

        (a)    If the licensee or sublicensee fails to correct such violation and Concurrent User fails promptly to take steps to enforce such provisions within ten (10) business days after receiving written notice from the City of a violation of such provisions, and fails to complete such enforcement within ninety (90) days after receiving such written notice, and the licensee or sublicensee fails to correct such violation, the City shall be entitled to enforce such provisions as a third party beneficiary of such provisions (such right to be included in all licenses or sublicenses of the Concurrent User) and shall be entitled to indemnification from the Concurrent User for the reasonable cost of such enforcement actions, including attorneys fees.  Any violation of a license or sublicense provision relating to the quality of restaurant services or goods bearing the Mark as provided in Section 2.04(d) and Section 10 of this Agreement shall be governed by Section 10 and not by this Section 7.02(a).

(b)     Notwithstanding Section 7.02(a), in the event that a licensee or sublicensee of the Concurrent User violates a provision of its license or sublicense that reflects the terms of this Agreement concerning sales of goods or services within the Product or Restaurant Restricted Areas; the proper use of disclaimers under Sections 2.04(b) or 3.04(a), or the restrictions in Sections 2.04(c) or 3.04(b); or the sale of illegal or prohibited services or goods under Sections 2.04(g) or 3.04(d), and such licensee or sublicensee fails to cure such violation within twenty (20) days after Concurrent User receives written notice of such breach, the City shall be entitled to enforce such provisions as a third party beneficiary of such provisions (such right to be included in all licenses or sublicenses of the Concurrent User), and shall be entitled to indemnification from the Concurrent User for the reasonable cost of such enforcement actions, including attorneys fees. In the event that the City commences enforcement against a licensee or sublicensee pursuant to this Section 7.02(b), including a written demand for compliance, and such licensee or sublicensee fails to cure such violation within fifteen (15) days thereafter, the City acting on behalf of the Concurrent User may terminate the license or sublicense at the particular location where such violation occurred or for the goods in relation to which such violation occurred, on three (3) business days notice, and Concurrent User hereby grants City the irrevocable right and authority to take such action.

7.03    Any licensees or sublicensees of Concurrent User or the City, and any successors thereto, must agree in writing to be bound by all the terms, conditions and limitations contained in this Agreement and shall execute an agreement in the form annexed hereto as Exhibit G. Any license or sublicense not complying with this requirement shall be void and without effect. The Concurrent User shall provide the City with a copy of each license and sublicense, including any amendments or renewal agreements, within five (5) business days after the execution of same; provided, however, that Concurrent User may redact the financial terms thereof.

## 8.    Assignment

8.01    The Concurrent User may assign this Agreement to a third party, provided that such third party and any successor thereto agree in writing to be bound by all the terms, conditions and limitations contained in this Agreement. The assignee shall execute an agreement in the form annexed hereto as Exhibit H. Any assignment not complying with this requirement shall be void and without effect. Such assignments as described herein shall only be in whole and not in part, i.e., there shall only be one Concurrent User at any given time. The Concurrent User shall provide the City with a copy of any assignment under this Section 8 within five (5) business days of the execution of same.

8.02    Each right and obligation of the Concurrent User hereunder shall be a right or obligation of the successors and assigns of the Concurrent User, unless explicitly stated to the contrary herein.

8.03    The Parties hereby acknowledge and agree that upon the Concurrent User's assignment of this Agreement, the rights, duties and obligations of the assignor hereunder shall immediately cease and such rights shall be fully vested in, and such duties and obligations shall be delegated to, and be the sole obligations of, the assignee of this Agreement. Reference to the Concurrent User in this section shall include all agents, employees and representatives thereof.

## 9.    **Actions Involving Alleged Infringements**

9.01    The City or its successors shall have the sole right, authority and discretion to take action regarding allegedly infringing or other conduct that may adversely affect the Restaurant Mark or any other mark related to the Central Park Goods or Services or other City services within the Restaurant Restricted Area at its own cost.

9.02    The Concurrent User shall have the first right to take action regarding allegedly infringing or other conduct that may affect the Concurrent User's Marks or the Product Marks, at its own cost.  The City will cooperate in such enforcement efforts by the Concurrent User to the extent legally necessary and at the sole cost of the Concurrent User; provided, however, that where the City is not an indispensible party, the City shall not be required to join in any action as a party unless Concurrent User agrees to pay all fees, costs and expenses of mutually approved outside counsel to represent the City.  The Concurrent User shall indemnify and hold the City harmless from any expense, cost or liability incurred by the City in connection with any enforcement actions on the part of the Concurrent User, including the cost of separate counsel to represent the City in the event that the City is named as a defendant in any action arising from or related to the alleged actions of the Concurrent User or its licensees or sublicensees.

9.03    The Concurrent User shall not pursue or settle any claim or action on terms that may adversely affect the City's interest in the Mark absent the prior written approval of the City, which shall not be unreasonably withheld.

9.04    The City and the Concurrent User shall reasonably cooperate at their own expense in opposing applications for registration of the Mark or any confusingly similar variation, by any third party that would adversely affect their rights, including but not limited to an application to register the Mark filed by Eric Karich for "bar and restaurant services" at the U.S. Patent and Trademark Office (Ser. No. 77/902,552).

9.05    If enforcement efforts relating to the Restaurant Mark, the Concurrent User's Marks or the Product Marks are initiated by one Party and later joined by the other Party and result in a monetary award or settlement being paid by the infringer, such monies shall first be used to reimburse both Parties for all out-of-pocket expenses incurred in connection with such proceeding; thereafter, any monies remaining shall be distributed as follows:

        (a)    For enforcement related to restaurant services, the City shall receive seventy-five percent (75%) and the Concurrent User shall receive (25%).

        (b)    For enforcement related to Product Marks, the Concurrent User shall receive seventy-five percent (75%) and the City shall receive (25%).

9.05    Licensees and sublicensees of the Concurrent User shall report alleged infringements to the Concurrent User (which shall forward such reports to the City), but licensees and sublicensees otherwise shall have no authority to take any enforcement action with respect to any alleged infringement of the Mark.

**10.     Minimum Standards**

10.01   Concurrent User acknowledges that the Mark represents a high level of quality in the provision of restaurant services, bar services and catering services with regard to cleanliness, food handling and preparation and compliance with laws and regulations regarding such services (such level of quality, and all requirements of this section, the "Acceptable Level of Quality"). With respect to any services offered by the Concurrent User under the Concurrent User's Mark, the Concurrent User agrees to maintain an Acceptable Level of Quality.   Any licensee or sublicensee of the Concurrent User's Mark shall have experience or training in restaurant operations.

10.02   All products offered under the Mark by Concurrent User or the City, or their respective licensees and sublicensees, must meet or exceed the requirements imposed by any laws, rules and regulations of any locations where they are marketed or sold and shall be consistent with a high level of quality and workmanship for comparable trade goods. With respect to products offered under the Product Marks that the City consents to be sold in the Product Restricted Area, Concurrent User shall comply with the requirements of Exhibit E hereto.

10.03   The City shall have the right to ascertain whether the goods or services offered by the Concurrent User or its licensees or sublicensees under the Mark are in compliance with the provisions of this section, and the Concurrent User shall reasonably cooperate with the City's efforts to reasonably determine such compliance.   The City shall have the right to inspect and approve restaurant services offered under the Concurrent User's Mark or goods licensed for sale within the Product Restricted Area.   The Concurrent User shall also permit the City reasonable access to Concurrent User's restaurant facilities during normal business hours to inspect the services offered under the Concurrent User's Mark, and shall require its licensees and sublicensees to provide such access to the City.

10.04   If the City reasonably believes that the Concurrent User or any licensee or sublicensee is not maintaining an Acceptable Level of Quality respecting a particular service offered under the Concurrent User's Mark, the City shall provide written notice to Concurrent User, setting forth with reasonable specificity the grounds upon which this determination is based.

(a)     Concurrent User shall provide a written reply within seven (7) business days (the "Reply") that either (i) confirms that the objectionable items have been corrected (or if not reasonably capable of correction within seven (7) business days, that such objectionable items are being corrected and will be corrected within thirty (30) days), (ii) refutes the objections raised by the City, or (iii) otherwise responds to such objections.

(b)     If the City reasonably believes that the alleged failure to maintain an Acceptable Level of Quality is still ongoing (other than an item not reasonably capable of correction within seven (7) business days) after the receipt of the Reply (or if Concurrent User fails to reply during such seven (7) business day period), the City shall provide further written notice to Concurrent User setting forth with reasonable specificity the City's continuing objection and Concurrent User shall then have seven (7) business days in which to provide a written reply to the City that (a) confirms that the objectionable items have been corrected, or (b) refutes the objections raised by the City.

(c) If Concurrent User has stated that the alleged failure is an item not reasonably capable of correction within seven (7) business days, Concurrent User shall report every ten (10) business days to the City on its progress in correcting such failure during such thirty (30) day period.

(d) In the event that a failure to maintain an Acceptable Level of Quality has not been corrected within the time periods set forth above, the City shall have the right (i) if the location is operated by Concurrent User, to terminate this Agreement with regard to the Concurrent User's right to use the Concurrent User's Mark at the affected location, and (ii) if the location is operated by a licensee or sublicensee of Concurrent User, the City acting on behalf of Concurrent User may terminate the license or sublicense at the particular location where such violation occurred, and Concurrent User hereby grants City the irrevocable right and authority to take such action, on three (3) business days' written notice.

10.05 With regard to the Central Park Goods, the City acknowledges that any Product Mark Registration licensed by Concurrent User to the City pursuant to Section 3.06 represents a high level of quality with regard to such products. With respect to any Central Park Goods subject to such license, the City agrees to maintain a level of quality consistent with such high level of quality and consistent with the products offered by Concurrent User under such Product Marks.

## 11. Assistance with Registration of Marks

11.01 If any application by the City to register a mark that is within the City's rights under this Agreement is refused, and such refusal is based in whole or in part upon the existence of an application or registration filed by Concurrent User, Concurrent User shall provide such assistance as may be required to permit the City to proceed with the desired registration and/or use of the Mark (initially in the form of a consent to register) at the City's cost.

11.02 If any application by Concurrent User to register a mark that is within Concurrent User's rights under this Agreement is refused, and such refusal is based in whole or in part upon the existence of an application or registration filed by the City, the City shall provide such assistance as may be required to permit the Concurrent User to proceed with the desired registration and/or use of the Mark (initially in the form of a consent to register) at the Concurrent User's cost.

## 12. Term and Termination

12.01 Unless terminated, this Agreement shall remain in effect as long as both Parties are using the Mark for any goods or services, provided, however, that if only one Party is using the Mark on any goods or services, the Agreement shall nonetheless remain in effect as long as, and only so long as, the Party not using the Mark (i) has a *bona fide* intent to begin using, and actually begins using, the Mark on any goods or services no later than December 31, 2013, or (ii) ceased using the Mark, but has reasonable grounds for ceasing use and has plans to, and actually does, resume use of the Mark for any goods or services in the reasonably foreseeable future, not to exceed three (3) years from the date use ceased.

12.02 In the event of a breach, other than a *de minimis* breach, by Concurrent User of a provision of this Agreement concerning (i) sales of goods within the Product Restricted Area or services within the Restaurant Restricted Areas; (ii) the proper use of disclaimers under Sections

2.04(b) or 3.04(a), or the restrictions in Sections 2.04(c) or 3.04(b); (iii) the sale of illegal or prohibited services or goods under Sections 2.04(g) or 3.04(d) or (iv) the execution of a license or sublicense that is not consistent with and does not reflect the terms of this Agreement as required by Section 7.01, the City shall provide written notice to the Concurrent User of such breach, and if the Concurrent User does not cure such breach within twenty (20) business days after Concurrent User's receipt of written notice of such breach from the City, the City may provide written notice to Concurrent User immediately terminating this Agreement and/or the City's consent to use the Concurrent User's Mark or Product Mark with regard to the particular goods or services that are the subject of such breach and/or the City may take such other enforcement actions as it deems appropriate to protect its interests, including but not limited to, filing an action for trademark infringement and/or a petition to cancel the registrations for such marks, and in such event and for purposes of such action, the Concurrent User agrees that a likelihood of consumer confusion shall be presumed to exist and Concurrent User irrevocably waives and agrees not to interpose any legal or equitable defense that does not go to the merits of the action, including incontestability of the registration, statute of limitations, waiver, laches, delay or estoppel. In the event of a breach of the type addressed in this Section 12.02 that is a de minimis breach, the City shall have the right to provide written notice to the Concurrent User of such breach demanding cure. For the avoidance of doubt, this Section 12.02 applies to the Concurrent User, and Section 7.02 applies to licensees and sublicensees of the Concurrent User.

12.03 In the event that a failure to maintain an Acceptable Level of Quality has not been corrected within the time periods set forth in Section 10.04 above, the City shall have the right to terminate this Agreement with regard to the Concurrent User's right to use the Concurrent User's Mark at the affected location, pursuant to Section 10.04(d).

12.04 Concurrent User acknowledges that the City will suffer immediate and irreparable injury by reason of any breach specified in Section 12.02 and 12.03 that is not cured within the time periods specified therein, and agrees that remedies available at law (such as monetary damages) are inadequate to compensate for such injury. The City shall not be required to post a bond in any action to enforce these provisions.

13. **Representations and Warranties of Concurrent User**

13.01 The Concurrent User hereby represents and warrants that (i) such Party is a [limited liability company] duly organized and validly existing under the laws of its state of formation, (ii) such Party has full right, power and authority to enter into this Agreement and to perform its obligations hereunder and (iii) this Agreement is a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms.

14. **Indemnification and Insurance**

14.01 Each Party hereby agrees to indemnify, defend and hold harmless the other, their affiliates and respective officers, agents, and employees, from and against any claims, judgments, demands, causes of action, damages, losses, costs and expenses, including but not limited to reasonable attorneys' fees, which may be made or asserted by third persons in connection with the indemnifying party's acts or omissions or exercise of any rights or duties under this Agreement. Such indemnification shall further extend to any Party's failure to comply

with the terms of this Agreement and any unauthorized use of any trademark, copyright infringement or the like in connection with the manufacture, design, sale, advertising, promotion or use of the Mark. Such obligations shall survive and continue beyond any termination or expiration of this Agreement.

14.02 The Concurrent User, any licensee, and their respective successors or assignees must carry paid up commercial general liability insurance in the sum of not less than three million dollars ($3,000,000) per occurrence to protect the City against any and all claims, loss or damage, whether in contract or tort, including claims for injuries to, or death of persons, or damage to property, whether such injuries, death or damages be attributable to the statutory or common law negligence or any other acts of the Concurrent User, any licensee, their respective employees, or otherwise in connection with the license granted hereunder. Such insurance shall be obtained from a company, or companies, that may lawfully issue the required policy and have an A.M. Best rating of at least A-7 or a Standard and Poor's rating of at least AA, unless prior written approval is obtained from the Mayor's Office of Operations. Such policy or policies shall name the City, its officers and employees as additional insureds, and shall provide that in the event of cancellation the City shall be notified at least thirty (30) days in advance of the cancellation, and shall provide that the carrier shall appear, defend and indemnify the City, including the agents, servants and employees of the City, in connection with all such claims, loss or damage. Prior to the effective date of this Agreement, the Concurrent User shall provide to the City a certificate of insurance, in a form acceptable to the City, certifying the issuance and effectiveness of the required insurance policy. The Concurrent User and any licensee shall deliver to the City a copy of the required insurance policy annually. Such insurance shall be maintained for at least six (6) years after the last date of sale of any goods or services under the Mark. In the event that the Concurrent User, any licensee or their respective successors or assignees fail at any time to carry adequate liability insurance as required herein, the City shall have the right to terminate this Agreement immediately. The existence of such insurance shall in no way limit the Parties' indemnification of each other under this Section.

## 15.  **Relationship of the Parties**

15.01 Nothing contained herein shall be construed to place the Parties in the relationship of partners or joint venturers, or principal and agent, or employer and employee, and no Party shall have the power to obligate or bind the other Party in any manner whatsoever.

## 16.  **Notices**

16.01 All communications, notices and exchanges of information contemplated herein, or required or permitted to be given under this Agreement, must be in writing and shall be sent by hand, by registered or certified mail, or by overnight courier. Unless specifically provided to the contrary, notices will be deemed effective when delivered in person or on the date five (5) business days after it is placed in the mail, postage prepaid, or one (1) business day after being deposited with an overnight courier, directed to the following addressees:

If to the Concurrent User:

With a copy to:

If to the City:

With a copy to:

Notification of a requested change in the address of a Party or the identity of the designated recipient of notices under this section must be provided in the same manner as any other notice.

## 17.    **Miscellaneous Provisions**

17.01    Enforceability.  If any portion or provision of this Agreement is to any extent declared unenforceable by a court of competent jurisdiction, then such provision will thereby be deemed to be reformed to the minimum extent necessary to make it enforceable. Each portion and provision of this Agreement is and will be valid and enforceable to the fullest extent permitted by law.

17.02    Entire Agreement.    This Agreement constitutes and contains the entire agreement between the Parties concerning the subject matter of this Agreement and supersedes all prior negotiations, proposed agreements, and/or understandings, if any, between the Parties concerning the subject matter of any of the terms of this Agreement.

17.03    Amendment; Waiver. This Agreement may not be modified except by another writing executed all of the Parties. No waiver of any provision of this Agreement will be enforceable against a Party unless such waiver is expressly set forth in writing and such writing is signed by such Party. No failure or delay by any Party in exercising any right hereunder shall operate as a waiver or relinquishment of the future performance thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.

17.04   Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, and, with regard to the City, its vendors, contractors, concessionaires, or agents.

17.05   Further Assurances.   Each of the Parties hereto shall perform such further acts and execute and deliver or cause to be executed and delivered such further documents as may be reasonably necessary or appropriate to carry out the intent and purpose of this Agreement, including, without limitation, any and all documents necessary for compliance with statutes and regulations with respect to trademark applications and registrations (including, without limitation, consents to the applications to register trademarks, to the extent such registration would be in accordance with the provisions of this Agreement).

17.06   Governing Law; Jurisdiction. This Agreement is governed by, and is to be interpreted and construed in accordance with, the laws of the State of New York, as applied to agreements among residents of the State of New York entered into and to be performed entirely within the State of New York, and without regard to conflict of law principles.  Each Party (and, without limitation, any licensee or sublicensee of Concurrent User) hereby irrevocably submits to the exclusive jurisdiction of, and venue in, any state or federal court located within City of New York in the state of New York for the purposes of any suit, action or other proceeding arising out of this Agreement, and agrees to commence any such suit, action or other proceeding only in such courts.

17.07   Counterparts.  This Agreement may be executed in one or more counterparts (and may be delivered via facsimile or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such Party can be seen), each of which will be deemed an original and all of which together will constitute one and the same instrument.

17.08   No Third Party Beneficiaries.  Unless otherwise expressly provided herein, nothing in this Agreement is intended, or shall be construed, to confer upon or give any person or entity other than the Parties hereto and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS HEREOF, the Parties have executed this Agreement as of the date first set forth above.

THE CITY OF NEW YORK

By:_____

Title:_____

Date:_____

Approved as to form

_____
Acting Corporation Counsel

[CONCURRENT USER]

By:_____

Title:_____

Date:_____