# EXHIBIT A

## Current Logo



# EXHIBIT B

## Restricted Area in Pennsylvania

The Restricted Area in Pennsylvania shall consist of the following counties:

- Bucks
- Lehigh
- Berks
- Lebanon
- Dauphin
- Perry
- Cumberland
- Adams
- York
- Lancaster
- Chester
- Montgomery
- Delaware
- Philadelphia

A map of Pennsylvania is provided below for ease of reference.



# EXHIBIT C

## Disclaimers

All uses of the Concurrent User's Mark for Restaurant Services and all use of the Product Marks and Oil and Dressing Mark (e.g., product packaging, bottle labels, promotional materials, print advertising, menus, invoices and quotes, business cards and stationery, website uses) other than for outside signage shall use the following disclaimer: "Not Affiliated with Tavern on the Green in Central Park in New York City." The typeface used for the disclaimer shall, in all instances, be the same type and color as the typeface used for the most prominent use of the Mark on the page (e.g., bold trademark typeface requires bold typeface disclaimer) and shall appear immediately below and in close proximity to the first use of the Mark. The point size used for the disclaimer shall be a minimum of 12 point where the largest typeface for the Mark is 36 point or less. Where the point size for the largest use of the Mark is greater than 48 point, the typeface for the disclaimer shall be 25% of such type, but not less than 18 point, with the additional requirement that any disclaimer that is less than 20 point shall be boldface.

Outdoor accessory, on-site signage for use of the Concurrent User's Mark: A disclaimer shall not be required for outdoor signage at the entrance to a restaurant where only the Concurrent User's Mark appears without added text. Outdoor accessory signage includes awnings, entry doors, neon signage and stenciled lettering on windows.

Disclaimers within Restaurant: Signage or placards shall be placed or affixed in the line of sight of customers in the following areas of the restaurant: where customer/guests are greeted/check-in/make reservations; the bar area; the coat check area; on the wall at eye level adjacent to bathroom entry doors. The lettering of the disclaimer shall be at least one-half inch in height and read as follows: "This Restaurant (or Establishment) Is Not Affiliated with Tavern on the Green In Central Park In New York City."

Billboards and other non-accessory outdoor signage: All outdoor signage promoting restaurant services or products using the Mark, including but not limited to billboards and posters, shall include the disclaimer with a asterisk accompanying the most prominent use of the Mark ("*Not Affiliated with Tavern on the Green in Central Park in New York City") immediately below the largest use of the Mark in said signage, using lettering that is not less than 25% of the size of the lettering used for the Mark in the same type and color as the lettering used for the Mark.

# EXHIBIT D

## Acceptable Images

# Tavern Interior Photos

June 9, 2010








# EXHIBIT E

## Product Standards in the Product Restricted Area

(a) Any products bearing the Mark that the City consents to be sold in the Product Restricted Area shall meet or exceed the requirements imposed by any and all laws, regulations, government standards, guidelines, manufacturing codes, rules, and the like applicable to such products. Without limiting the foregoing, no such products shall be manufactured from any flammable, explosive, toxic, or otherwise inherently dangerous materials or substances, nor designed so as to constitute any inherent danger to the consumer. Further, the Concurrent User agrees that the products shall be of a standard of quality at least as high as that of any product samples initially approved by the City so as to be suited to their exploitation and to the protection and enhancement of the Marks and the goodwill pertaining thereto.

(b) Such products shall be manufactured in accordance with the manufacturing specifications, protocol, safety, and quality standards that have been reviewed and approved in writing by the City ("Specifications"), which, once approved, shall be deemed to be a part of this Agreement. The City may amend such Specifications from time to time and shall provide the Concurrent User with reasonable notice of such changes so that the products may be adjusted to meet such changed quality standards, if required.

(c) The Specifications shall include at least the following information (and other information which the City may request regarding particular products): (i) a description of the materials used in the products, the materials' dimensional tolerances, performance and durability requirements, specifications that enable the materials to meet governmental regulatory requirements (if any) and such other appropriate information that will accurately describe the products and their expected performance during use by the consumer; and (ii) a quality assurance plan that is used to assure the continuing acceptable quality of the products. The plan shall include a description of the quality controls observed in the products' manufacture, and the procedures followed to audit and verify continued quality and conformance to specifications of the products, as well as applicable laws and regulations.

(d) If such product is not yet on the market outside the Product Restricted Area, the Concurrent User agrees to submit, at the City's request and at no cost to the City (i) initial sketches and/or design concepts; (ii) finished artwork or final proofs; (iii) prototypes or pre-production samples; and (iv) a minimum of one (1) and twelve (12) final production samples (the "Samples") of the products (and any variations thereof) for the City's inspection, testing, analysis and approval prior to any sale or shipment of the products to retail stores physically located in the Product Restricted Area. If such product is already on the market outside the Product Restricted Area, the Concurrent User agrees to submit twelve (12) Samples from the current production run of such products for the City's inspection, testing, analysis and approval prior to any sale or shipment of the products to retail stores physically located in the Product Restricted Area. Concurrent User shall also provide initial samples of subsequent production run(s) if such subsequent production run(s) vary in any manner from prior runs.

(e) The City shall use reasonable efforts to communicate its written consent or disapproval within forty (40) days of receipt of Samples of the products. Any Samples not

expressly approved shall be deemed disapproved. If the Samples are approved pursuant to this paragraph, the Concurrent User shall not depart therefrom in any material respect without the City's prior written consent, and the City shall not withdraw its approval of the Samples except for good cause.

      (f) The Concurrent User shall at its own cost handle all product warranty and/or guarantee issues, responses and compliance requirements, as well as all consumer inquires or complaints (collectively, "<u>Consumer Inquiries</u>") relative to any of the products. The City shall forward to the Concurrent User for handling any and all such Consumer Inquiries that the City receives. Upon request by the City, the Concurrent User shall advise the City in writing of the manner in which it handled any Consumer Inquiry. In addition, the Concurrent User shall provide the City with a quarterly report containing all data and information regarding Consumer Inquiries handled during the quarter.

      (g) The Concurrent User shall immediately advise the City of any product recall considerations or deliberations and provide the City with the right to attend and have input into such deliberations. The City shall have the ability to declare a product recall of such products as the City determines in good faith after consulting with the Concurrent User that any product recall is necessary for reasons of public health, safety, welfare or damage to reputation or good will. The Concurrent User shall bear any and all costs related to any product recall whether voluntary, required by a governmental authority or the City. The Concurrent User shall have in place a comprehensive lot tracking program, starting with raw materials, to ensure such recall effectiveness.

      (h) The Concurrent User agrees not to use child labor in the manufacture of or otherwise in connection with any Products. The term "child" shall refer to a person younger than the local legal minimum age for employment or the age for compelling compulsory education, but in no case shall any children younger than fifteen (15) years of age (or fourteen (14) years of age where local law allows) be used to manufacture, package or sell the products. In addition, the Concurrent User agrees to comply with all applicable minimum wage, overtime, occupational safety and health and environmental protection laws in the manufacture and packaging of products. The Concurrent User shall perform all obligations under this Agreement in accordance with applicable provisions of federal, state and local laws, rules and regulations as are in effect from time to time.

# EXHIBIT F

## Royalty Statements; Payments/Audit

The Concurrent User shall furnish to the City the following no later than forty-five (45) days after the end of each calendar quarter (beginning with the calendar quarter in which the initial shipment of any product to which the City has consented in writing to be sold within the Product Restricted Area):

(a) complete and accurate statements in a format approved by the City and certified in writing to be accurate by an officer of the Concurrent User, itemized by product item number and showing the net number of units sold inclusive of returns, item description and Average Sales price of the product sold by the Concurrent User or any licensee during the preceding quarter. Such statements shall be furnished to the City whether or not any products have been sold during the preceding quarter; and

(b) payment of the royalty and/or guaranteed minimum royalty due from sales during the preceding quarter.

The receipt or acceptance by the City of any statements furnished pursuant to this Agreement or any royalties paid hereunder (or the cashing of any royalty checks paid hereunder) shall not preclude the City from questioning the correctness of such statement or payment at any time. In the event any inconsistencies or mistakes are discovered in such statements or payments, they shall immediately be rectified and the appropriate payments made by the Concurrent User. In the event of an overpayment by the Concurrent User, the Concurrent User may deduct such mutually verified overpayment from any earned royalty or guaranteed minimum royalty payment due with the next regular quarterly royalty statement and payment. In the event no further royalty payments would be forthcoming after discovery and mutual verification of the payment, then the Concurrent User shall receive a refund of such overpayment within thirty (30) days after its written request for a refund is received by the City.

In the event that the Concurrent User fails to make any payments, including earned royalty and audit findings, when such payments are due under this Agreement, interest shall be charged at an annual rate of eighteen percent (18%), or the maximum rate allowed by law, whichever is lower. All payments made hereunder shall be in United States currency drawn on a United States bank. The Concurrent User shall keep accurate books of account and records covering all transactions related to this Agreement for at least six (6) years after termination or expiration of this Agreement.

The City or its authorized agent shall have the right during business hours upon forty-eight (48) hours' advance notice to examine and request copies of the Concurrent User's books, records, and accounts and all other documents and materials in the possession or under the control of the Concurrent User relating to the sale of products featuring the Mark to such extent as may be necessary to determine the accuracy or inaccuracy of any royalty statements submitted by the Concurrent User to the City. The Concurrent User shall segregate its records

and agrees that such audit may be used as a basis for settlement of charges under this Agreement. The City may also at any time select any independent accounting firm to review the Concurrent User's books, records and accounts, and to check shipments and verify the account (hereinafter referred to as the "Audit"). In the event that the Audit reveals any underpayment by the Concurrent User to the City, the Concurrent User shall remit payment for the amount shown to be due within ten (10) days, of receipt of official audit report plus a late charge in the amount of eighteen percent (18%) per annum, or the maximum rate allowed by law whichever is lower, on all amounts shown to be owing by the Concurrent User. In the event that the Audit determines that the Concurrent User has underpaid by an amount equal to five percent (5%) or more of the total amount shown to be due to the City for the period audited, the Concurrent User shall reimburse the City or its agent for all costs and expenses of the Audit. In addition, if the discrepancy is an amount equal to five percent (5%) or more and a discrepancy or underpayment of 5% or more had been found in at least one prior instance, the City may terminate this Agreement by giving the Concurrent User notice within sixty (60) days after receipt of the audit report disclosing the discrepancy. The Concurrent User shall retain all books of account and records relating to this Agreement for at least six (6) years after the termination or expiration of this Agreement, and any renewals thereof and the City's right to audit such records during the duration of this Agreement and for six (6) years thereafter. The parties acknowledge and agree that the powers, duties, and obligations of the Comptroller of the City of New York pursuant to the provisions of the New York City Charter shall not be diminished, compromised, or abridged in any way.

# EXHIBIT G

## Form of Licensee Agreement

# LICENSEE AGREEMENT

This Licensee Agreement (the "<u>Agreement</u>") is entered into as of _____ \_\_, 2011 by and between _____ ("<u>Concurrent User</u>") and _____ ("<u>Licensee</u>"). Concurrent User and Licensee are each a "<u>Party</u>" and together the "<u>Parties</u>."

WHEREAS, Concurrent User and the City of New York (the "<u>City</u>") are parties to that certain Use Agreement dated as of _____ \_\_, 2011, pertaining to the use of the "Tavern on the Green" trademarks (the "<u>Use Agreement</u>"); and .

WHEREAS, Concurrent User and Licensee wish to enter into an agreement whereby Concurrent User licenses rights under the Use Agreement to Licensee (the "<u>License Agreement</u>").

NOW, THEREFORE, in consideration of the promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the terms set forth herein.

1. Licensee acknowledges receipt of a copy of the Use Agreement and hereby unconditionally agrees to adhere to all the terms, conditions and limitations on the use of the "Tavern on the Green" trademarks set forth in the Use Agreement.

2. This Agreement is independent of any other agreement that may exist between Concurrent User and Licensee.

3. Licensee acknowledges that the Use Agreement may not be amended or modified except by another writing executed by Concurrent User and the City. Any change or modification without the City's consent shall be of no force or effect as to the City and may constitute grounds for termination of the Use Agreement and/or the License Agreement.

4. If any portion or provision of this Agreement is to any extent declared unenforceable by a court of competent jurisdiction, then such provision will thereby be deemed to be reformed to the minimum extent necessary to make it enforceable. Each portion and provision of this Agreement is and will be valid and enforceable to the fullest extent permitted by law.

5. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

6. This Agreement is governed by, and is to be interpreted and construed in accordance with, the laws of the State of New York, as applied to agreements among residents of the State of New York entered into and to be performed entirely within the State of New York, and without regard to conflict of law principles. Each Party hereby irrevocably submits to the exclusive jurisdiction of, and venue in, any state or federal court located within City of New York in the State of New York for the purposes of any suit, action or other proceeding arising out of this Agreement, and agrees to commence any such suit, action or other proceeding only in such courts.

7. This Agreement may be executed in one or more counterparts (and may be delivered via facsimile or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such Party can be seen), each of which will be deemed an original and all of which together will constitute one and the same instrument.

IN WITNESS HEREOF, the Parties have executed this Agreement as of the date first set forth above.

[CONCURRENT USER]

By:_____

Title:_____

Date:_____


[LICENSEE]

By:_____

Title:_____

Date:_____

822927

# EXHIBIT H

## Form of Assignment Agreement

820718

# ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Assignment and Assumption Agreement") is entered into as of _____, 20\_\_ by and between _____ ("Assignor") and _____ ("Assignee"). Assignor and Assignee are each a "Party" and together the "Parties."

WHEREAS, Assignor and the City of New York (the "City") are parties to that certain Use Agreement dated as of _____, 2011, pertaining to the use of the "Tavern on the Green" trademarks (the "Use Agreement"); and

WHEREAS, Assignor wishes to assign all of its rights and delegate all of its obligations under the Use Agreement to Assignee, and Assignee wishes to accept such assignment and assume such obligations.

NOW, THEREFORE, in consideration of the promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the terms set forth herein.

1. Assignor hereby assigns, transfers, and conveys to Assignee, and Assignee hereby accepts, all of Assignor's right, title, and interest in and to the Use Agreement and all of the rights, benefits and privileges of Assignor thereunder, in each case to the fullest extent assignable under applicable law.

2. Assignor hereby delegates to Assignee, and Assignee hereby assumes, all obligations, responsibilities and duties of Assignor under the Use Agreement.

3. Assignee acknowledges receipt of a copy of the Use Agreement and agrees to be bound by all the terms, conditions and limitations contained in the Use Agreement.

4. The Parties hereby acknowledge and agree that upon the execution and delivery of this Agreement by both Parties, the rights, duties and obligations of Assignor under the Use Agreement shall immediately cease and such rights shall be fully vested in and such duties and obligations shall be delegated to, and be the sole duties and obligations of, Assignee.

5. This Agreement is independent of any other agreement that may exist between the Assignor and Assignee.

6. Assignee acknowledges that the Use Agreement may not be amended or modified except by another writing executed by Concurrent User thereunder and the City. Any change or modification without the City's consent shall be of no force or effect as to the City and may constitute grounds for termination of the Use Agreement.

7. If any portion or provision of this Agreement is to any extent declared unenforceable by a court of competent jurisdiction, then such provision will thereby be deemed to be reformed to the minimum extent necessary to make it enforceable. Each portion and provision of this Agreement is and will be valid and enforceable to the fullest extent permitted by law.

8. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

9. This Agreement is governed by, and is to be interpreted and construed in accordance with, the laws of the State of New York, as applied to agreements among residents of the State of New York entered into and to be performed entirely within the State of New York, and without regard to conflict of law principles. Each Party hereby irrevocably submits to the exclusive jurisdiction of, and venue in, any state or federal court located within City of New York in the State of New York for the purposes of any suit, action or other proceeding arising out of this Agreement, and agrees to commence any such suit, action or other proceeding only in such courts.

10. This Agreement may be executed in one or more counterparts (and may be delivered via facsimile or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such Party can be seen), each of which will be deemed an original and all of which together will constitute one and the same instrument.

IN WITNESS HEREOF, the Parties have executed this Agreement as of the date first set forth above.

[ASSIGNOR]

By:_____

Title:_____

Date:_____


[ASSIGNEE]

By:_____

Title:_____

Date:_____