Howard B. Kleinberg, Esq.
Jessica G. Berman, Esq.
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York 11530-9194
Telephone: (516) 741-6565
Facsimile: (516) 741-6706

*Attorneys for Jil Mazer-Marino Chapter 7 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

In re:                                                      Chapter 11

TAVERN ON THE GREEN, L.P. and LEROY              09-15450 (ALG)
ADVENTURES, INC.,                                09-15448 (ALG)

                                                 (Jointly Administered)
                              Debtors.
----------------------------------------------------------------X

**MOTION OF THE CHAPTER 7 TRUSTEE, PURSUANT TO 11 U.S.C. §§
105 AND 363 AND FED. R. BANKR. P. 2002 AND 6004, FOR ENTRY OF
(I) AN ORDER (A) APPROVING COMPETITIVE BIDDING AND
AUCTION PROCEDURES, (B) APPROVING STALKING HORSE
BREAK-UP FEE, (C) SCHEDULING THE AUCTION AND SALE
HEARING AND APPROVING NOTICE THEREOF, AND (II) AN ORDER
APPROVING TRUSTEE'S SALE OF ESTATES' RIGHT, TITLE AND
INTEREST IN A USE AGREEMENT REGARDING THE NAME
"TAVERN ON THE GREEN" AND CERTAIN RELATED
INTELLECTUAL PROPERTY TO HIGHEST AND BEST BIDDER FREE
<u>AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS</u>**

Jil Mazer-Marino, the chapter 7 trustee (the "**Trustee**") of the bankruptcy estates

("**Estates**") of Tavern on the Green, L.P. and LeRoy Adventures, Inc., the above-captioned

debtors (the "**Debtors**"), by her attorneys Meyer, Suozzi, English & Klein, P.C., hereby moves

this Court pursuant to sections 105 and 363 of the United States Bankruptcy Code ("**Bankruptcy**

Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of two orders: the first order (the "**Bidding and Auction Procedures Order**") (a) approving competitive bidding and auction procedures, (b) approving the stalking horse break-up fee, and (c) scheduling the auction and sale hearing and approving notice thereof, and the second order (the "**Sale Order**") approving the Trustee's sale of the Estates' right, title and interest in a Use Agreement (as defined below) regarding the name "Tavern on the Green" and certain related intellectual property to the highest and best bidder free and clear of liens, claims, encumbrances and interests. In support of her motion, the Trustee sets forth as follows:

<u>**SUMMARY OF THE MOTION AND RELIEF REQUESTED**</u>

1.      After more than a year of negotiations with the City of New York (the "**City**"), a settlement was reached between the City and the Trustee respecting the parties' respective rights to use the name "Tavern on the Green." That settlement was approved by this Court on April 18, 2011. As part of the settlement, the City and the Trustee agreed to the terms of a Use Agreement (the "**Use Agreement**"). A copy of the Use Agreement is attached hereto as **Exhibit "A."** The Use Agreement contemplates that the Trustee will sell the Use Agreement in a Bankruptcy Code section 363 sale, and the purchaser of the Use Agreement will have the right to enter into the Use Agreement with the City. Upon entry into the Use Agreement with the City, the purchaser will be the Concurrent User, as such term is defined in the Use Agreement, and will have the right to use the name "Tavern on the Green" for restaurants and products, subject to the terms and conditions of the Use Agreement.

2.      In addition to the Use Agreement, the Estates own certain other valuable intellectual property related to the name "Tavern on the Green." Specifically, the Oil and

Dressing Mark, the Foreign Registrations, and the Product Application (each as defined below) (collectively, together with the Use Agreement, the "**Assets**").

3.      After extensive consultation with, and marketing efforts by the Trustee's Court retained agent, Streambank LLC ("**Streambank**"), the Trustee has obtained an offer for the Assets from Tavern International LLC (the "**Stalking Horse Bidder**") and has entered into an Asset Purchase Agreement, dated August 16, 2011 ("**Stalking Horse APA**"), with the Stalking Horse Bidder, subject, among other things, to higher and better offers and approval of this Court. A true and correct copy of the Stalking Horse APA is attached hereto as **Exhibit "B."**

4.      By this Motion, pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, the Trustee requests that the Court enter two orders granting the following relief in connection with the sale of the Assets (the "**Sale Transaction**") to the Stalking Horse Bidder or such other bidder who is selected by the Trustee as the bidder submitting the highest or otherwise best offer at the conclusion of an auction (the "**Successful Bidder**"). The two orders are:

a.      the Bidding and Auction Procedures Order, substantially in the form attached hereto as **Exhibit "C,"** which will authorize and approve, among other things: (i) the procedures (the "**Bidding and Auction Procedures**") for the conduct of the auction (the "**Auction**") of the Assets, substantially in the form attached as **Exhibit 1** to the Bidding and Auction Procedures Order, (ii) the payment, under certain conditions, of a break-up fee (the "**Break-Up Fee**"), (iii) the scheduling of a hearing (the "**Sale Hearing**") to approve any such Sale Transaction with respect to any bid accepted by the Trustee, and (iv) the form and manner of notice with respect to the proposed sale of the Assets, the Auction, and the Sale Hearing (the "**Sale Hearing Notice**") substantially in the form attached to the Bidding and Auction Procedures Order as **Exhibit "2;"** and

b.      the Sale Order, substantially in the form to be filed with the Court on or prior to the hearing to consider approval of, among other things, the Bidding and Auction Procedures (the "**Bid Procedures Hearing**"), that will, *inter alia,* approve (i) the sale of the Assets pursuant to Bankruptcy Code sections 105, 363(b), (f), and (m), and Bankruptcy Rules 2002 and 6004 in accordance with the terms of either the Stalking Horse APA or a

modified version thereof with the Successful Bidder, free and clear of all liens, claims, encumbrances, and other interests.

## JURISDICTION

5.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for relief requested are Bankruptcy Code sections 105(a) and 363 (b), (f) and (m) and Bankruptcy Rules 2002 and 6004.

## FACTS

### A.      General

6.      On September 9, 2009, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7.      The Debtors' cases were converted to cases under chapter 7 of the Bankruptcy Code by orders of this Court (the "**Bankruptcy Court**") dated March 10, 2010 and, on the same date, the Trustee was appointed interim chapter 7 Trustee of the Debtors' Estates pursuant to Bankruptcy Code section 701(a).

8.      On May 20, 2010, the Court approved the Trustee's application to retain Streambank as intellectual property disposition firm in the Debtors' chapter 7 cases.

9.      On May 28, 2010, at a duly convened meeting pursuant to Bankruptcy Code section 341, the Trustee qualified as permanent trustee of the Debtors' Estates pursuant to Bankruptcy Code section 702(d).

### B.      The Settlement

10.      Shortly after the conversion of the Debtors' cases to chapter 7 and the appointment of the Trustee, the Trustee and the City entered into negotiations with respect to pending litigation. The Debtors and the City had been litigating conflicting claims with respect to the right to use and the ownership of (1) the trademark "Tavern on the Green" for "Restaurant

Services" (Reg. No. 1,154,270) (the "**Restaurant Mark**"), and (2) the trademark "Tavern on the Green" for cooking oils, salad dressings, and dipping oils (Reg. No. 3,494,658) (the "**Oil and Dressing Mark**," and together with the Restaurant Mark, the "**Marks**"). After more than a year of negotiations with the Trustee following the conversion, the City and the Estates resolved their dispute respecting the Marks.

11.     The settlement is embodied in a stipulation (a copy of which is attached hereto as **Exhibit "D"**) and the Use Agreement which, together, establish the City's and the Estates' relative rights to the Marks and use of the name "Tavern on the Green" for restaurant and product use. The purchaser of the Assets, among other things, will have the right to become the Concurrent User as defined in the Use Agreement and may use the name "Tavern on the Green" for restaurants subject to certain conditions set forth in the Use Agreement.

12.     With respect to products, the Concurrent User may use the name "Tavern on the Green" for certain products such as food, home furnishings, apparel and accessories, provided that the products meet certain minimum standards and other conditions articulated in the Use Agreement.

13.     The Stipulation contains certain conditions and limitations, including the following:

a.      The Trustee is required to seek Bankruptcy Court approval of the sale of the Use Agreement on or before the date that is nine months after the order approving the Stipulation becomes a final order (*i.e.*, February 12, 2012), provided that the sale deadline can be extended with the City's consent.

b.      Absent the City's prior written consent, the Trustee is prohibited from selling the Use Agreement to a third party unless the consideration equals or exceeds $500,000.00 (the "**NYC Minimum Price**").

c.      The Trustee is required to sell the Use Agreement and the Oil and Dressing Mark to one buyer and there shall only be one Concurrent User at any given time under the Use Agreement. By way of clarification, the Use Agreement does not prohibit, and specifically contemplates, that the

Concurrent User may enter into license and sublicense agreements respecting the use of the name "Tavern on the Green."

14.     In addition, the Stipulation (which was also executed by TD Bank, N.A. ("**TD Bank**")) prescribes the use of Net Proceeds (as defined below) from the Sale of the Assets. Specifically, the Stipulation requires that:

  a.     The first Net Proceeds shall be distributed to TD Bank until TD Bank's claims against the estates (to the extent such claims are allowed secured claims) are paid in full.

  b.     The remaining Net Proceeds shall be distributed 25% to the City and 75% to the Estates.

15.     The term "Net Proceeds" means the total gross consideration paid to the Estates from the sale of the Assets, less the reasonable and customary costs of sale, including the commissions and expenses of Streambank, applicable taxes, if any, any break-up fees, expense reimbursements or other bidder protections as approved by the Bankruptcy Court and subject to TD Bank's approval, and the Trustee's commissions and reasonable attorneys' fees incurred in connection with the sale of Assets.

**C.     The Assets**

16.     The Assets being sold specifically include the following:

  a.     the Estates' right, title and interest in the Use Agreement;

  b.     the Oil and Dressing Mark;

  c.     the trademark registrations for "Tavern on the Green" in Japan and in the United Arab Emirates (the "**Foreign Registrations**");

  d.     the pending U.S. trademark application (Serial Number 85/063,715) for "Tavern on the Green" in certain product categories (the "**Product Application**"); and

  e.     any other intellectual property rights and/or goodwill owned by the Estates.

17.     As required under the Stipulation, the Assets are being sold to one Successful Bidder. The Trustee will not entertain bids for less than all of the Assets. Further, the purchase

price being offered by the Stalking Horse Bidder of $1,300,000.00 exceeds the NYC Minimum Price, thereby assuring the trustee that the Assets will not revert back to the City.

**D.     Liens, Claims and Encumbrances**

18.     TD Bank asserts a first priority lien on and security interest in substantially all of the Debtors' assets, including intellectual property.  TD Bank consents to the sale of the Assets, provided its liens attach to the Estates' interest in the Net Sale Proceeds (as defined in the Stipulation) to the same extent and in the same priority as TD Bank's liens attached to the Assets.  The Trustee is not aware of any other liens, claims or encumbrances to the Assets.

**E.     The Stalking Horse APA**

19.     The salient terms of the Stalking Horse APA are as follows[1]:

| | |
|---|---|
| Consideration for the Assets: | Purchase Price.  The aggregate consideration for the Assets is $1,300,000.00 in cash, payable and deliverable on Closing; and the assumption by Buyer of the Assumed Liabilities.  Concurrent with the execution and delivery of the Stalking Horse APA, Buyer delivered to Trustee $130,000.00, representing ten percent (10%) of the purchase price. |
| | Assumed Liabilities.  At the Closing, Buyer shall assume the following liabilities:  all liabilities of Seller for Transaction Taxes; and all liabilities and obligations arising on or after the Closing Date other than successor liability claims, relating to or arising out of the Assets. |
| Bankruptcy Court Approval: | The Stalking Horse APA and the Sale Transaction are subject to entry of an order approving the agreement and authorizing the sale of the Assets free and clear of all Interests. |
| Free and Clear of Liens: | The sale is to be made in accordance with the provisions of Bankruptcy Code sections 363(b) and (f), with the Assets being sold free and clear of all liens, claims, interests and encumbrances of whatever kind or nature (the "**Interests**"), but subject to the Assumed Liabilities, with such Interests, if any to attach to the net proceeds of sale. |

---

[1] This summary is provided for the convenience of the reader and is qualified in its entirety by the terms of the Stalking Horse APA.  Capitalized terms used in this section that are not defined have the meanings ascribed to them in the Stalking Horse APA.

| | |
|---|---|
| Higher or Better Offers: | Buyer acknowledges that consistent with Bankruptcy Code sections 363(b) and (f), Seller shall seek approval of the Stalking Horse APA subject to "higher or better" offers. A "higher or better" offer shall mean an offer that satisfies the following criteria: (a) the offer shall be an offer to purchase the Assets and assume the Assumed Liabilities for a Purchase Price of at least one million four hundred thousand dollars ($1,400,000.00) (the "**Minimum Initial Overbid**"); and (b) the offer shall be on substantially the same terms and conditions as set forth in the Stalking Horse APA. |
| Marketing Period: | Buyer acknowledges that during the Marketing Period, Seller may advertise or market the Assets, may conduct an auction, or take other action to obtain a higher or better offer. Marketing Period shall mean the period commencing on the date that this Agreement is executed and delivered by each party and ending on the next Business Day following the 25th day after entry of the Auction and Bid Procedures Order. |
| Break-Up Fee & Expense Reimbursement: | Subject to the approval by the Bankruptcy Court, if Trustee closes on a Competing Transaction, Seller shall pay to Purchaser a break-up fee and expense reimbursement equal to $65,000.00, payable by Seller if, as and when the closing of the Competing Transaction occurs and solely from proceeds of the Competing Transaction. Competing Transaction means a transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of all or any substantial portion of the Assets as a single, integrated transaction to a purchaser other than Buyer. |
| Other: | The Stalking Horse APA contains other usual and customary terms, including representations and warranties, covenants and termination provisions. |

## F.   The Bidding and Auction Procedures

20.   The Trustee believes that the Bidding and Auction Procedures, substantially in the form attached to the Bidding and Auction Procedures Order as **Exhibit "1,"** are appropriate and will maximize the recovery for the Estates in connection with the sale of the Assets. The Bidding and Auction Procedures provide an appropriate framework for selling the Assets in an orderly fashion and will enable the Trustee and her advisors to review, analyze, and compare all bids received to determine which bid(s) are in the best interests of the Estates.

21.     As further described in the Bidding and Auction Procedures, only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction. Bidding at the Auction will commence with the highest Qualified Bid submitted by Qualified Bidders prior to the Auction. The Trustee reserves the right, in her reasonable discretion and in the exercise of her business judgment, to establish and to reduce or increase the required incremental bids at any time during the Auction. All Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Stalking Horse Purchase Agreement or their respective Modified APAs, as applicable, at the Auction to improve such bids.

22.     The Trustee may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, *provided* that such rules are (i) not inconsistent with the Bidding and Auction Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder.

23.     The Trustee reserves the right to (i) determine, in her reasonable discretion and business judgment, which bid is the highest or otherwise best and (ii) reject at any time, without liability, any offer, other than the offer contained in the Stalking Horse APA, that the Trustee in her reasonable discretion and business judgment deems to be (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or in the Bidding and Auction Procedures Order, or (c) contrary to the best interests of the Estates.

24.     The Auction shall continue until the Trustee determines, and subject to Bankruptcy Court approval, that the highest or otherwise best offer for the Assets from among the Qualified Bidders (including the Stalking Horse Bidder) submitted at the Auction (the

"**Successful Bid**") has been obtained.  In making this decision, the Trustee may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidders' ability to close a given transaction, the proposed timing thereof, and rights of such Qualified Bidder and the Estates with respect to the termination thereof, the number, type and nature of any changes reflected in the Modified APA requested by each Qualified Bidder, and the net benefit to the Estates.

25.     The Qualified Bidder submitting such Successful Bid for the Assets shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the Modified APA.  The Stalking Horse Bidder can be designated the Back-Up Bidder.

26.     If no timely, conforming Qualified Bids, other than the Stalking Horse bid, are submitted by the bid deadline, the Trustee may determine to not hold the Auction and, instead, may request at the Sale Hearing that the Bankruptcy Court approve the Stalking Horse APA with the Stalking Horse Bidder.  However, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid for the Assets at the Auction (the "**Back-Up Bid**") shall be required to serve as the back-up bidder (the "**Back-Up Bidder**")  and keep such Back-Up Bid open and irrevocable pending closing.

27.     Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale Transaction because of a breach or failure to perform on the part of such Successful Bidder or otherwise, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Trustee will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

28.     Except as otherwise provided in the Bidding and Auction Procedures, Good Faith Deposits shall be returned to each bidder not selected by the Trustee as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the conclusion of the

Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the Trustee until the later of (i) two (2) business days after the closing of the sale transaction with the Successful Bidder; and (ii) forty-five (45) days after the final Sale Hearing.

29. The Trustee will sell the Assets for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Court after the Sale Hearing.

**G.**     **Notice of Sale, Auction, Sale Hearing, and Related Deadlines**

30. The Trustee proposes the following notice and other procedures to be implemented in connection with the sale process:

    a.     Notice of Sale, Auction, and Sale Hearing: Within three (3) business days after entry of the Bidding and Auction Procedures Order, the Trustee (or her agents) shall serve the Sale Notice, in substantially the form attached as **Exhibit "2"** to the Bidding and Auction Procedures Order, providing notice of the Bidding and Auction Procedures Order, this Motion, the Stalking Horse APA, the Auction, the Sale Hearing, and the proposed Sale Order by email, first class mail, facsimile, or overnight delivery service, upon: (1) the Office of the United States Trustee; (2) the attorneys for TD Bank; (3) the attorneys for the Stalking Horse Bidder; (4) those parties who have requested notice pursuant to Bankruptcy Rule 2002; (5) all known creditors of the Debtors and all entities known to have asserted any claims against the Assets or the Estates' interest in the Assets and other entities known to have asserted a lien, interest or encumbrance in or upon any of the Assets; and (6) all known bona fide entities that have previously expressed an interest in purchasing the Assets in the last twelve months preceding the date of the Motion (collectively, the "**Sale Notice Parties**"). The Trustee will also serve the entire motion package, exhibits and supporting documents on the U.S. Trustee, TD Bank, the City, the Stalking Horse Bidder and parties having filed a notice of appearance.

    b.     Date, Time, and Place of Auction: The Trustee proposes that the Auction be conducted at the offices of Meyer, Suozzi, English & Klein, P.C., 1350 Broadway, Suite 501, New York, NY 10018 or such other location as the Trustee may determine on a date approved by the Court commencing approximately twenty (20) days after entry of the Bidding and Auction Procedures Order at 10:00 a.m. (New York time).

    c.     Date, Time, and Place of Sale Hearing: The Trustee proposes that the Sale Hearing be held on the first business day that is three business (3) days following the Auction, or as soon thereafter as the Court may permit. The Sale Hearing may be adjourned, from time to time, without further notice to the Sale Notice Parties, creditors or other parties in interest other than

by announcement of the adjournment in open Court or on the Court's docket.

d. <u>Notice of Successful Bidder</u>: As soon as practicable after the Auction, the Trustee will provide electronic notice of the results of the Auction on the Court's docket.

e. <u>Objection Deadline to Sale Order</u>: The Trustee proposes that objections to the relief sought in the Sale Order shall be in writing, filed with Court no later than five (5) business days prior to the Sale Hearing, at 5:00 p.m. (New York time) and served so as to be actually received by such date and time upon the attorneys for the Trustee, TD Bank, the Office of the United States Trustee for Region 2, Streambank, LLC, and the Stalking Horse Bidder.

f. <u>Due Diligence Information</u>: Due diligence information provided to the Stalking Horse Bidder shall be made available to all prospective bidders who enter into appropriate confidentiality agreements with the Trustee.

## H. **Proposed Disposition of Sale Proceeds**

31. All proceeds from the sale of the Assets shall be deposited into a separate segregated account set up by the Trustee for such purpose and distributed as discussed below.

32. The first Net Proceeds shall be distributed to TD Bank until the TD Bank Claim (as defined in the Stipulation and to the extent it is an allowed secured claim against the Estates, following motion on notice to creditors, including the City, by TD Bank for allowance of such Claim) is paid in full. All Net Proceeds from the sale shall be subject to TD Bank's Lien (as defined in the Stipulation) until such time as the TD Bank Claim is paid in full.

33. The remaining Net Proceeds shall be divided between the City and the Estates. The Trustee shall retain seventy five percent (75%) of Net Proceeds for the Estates (for distribution pursuant to the priorities established in Bankruptcy Code section 706). The remaining 25% shall be distributed by the Trustee to the City.

34. For purposes of the Stipulation, Net Proceeds shall mean the total gross consideration paid to the Estates from the sale of the Assets, less the reasonable and customary costs of sale, including commissions and expenses of Streambank, LLC, applicable taxes, if any,

and any break-up fees, expense reimbursements or other bidder protections as approved by the Bankruptcy Court and subject to TD Bank's approval, which approval shall not be unreasonably withheld, and the Trustee's commissions and reasonable attorneys' fees incurred in connection with the sale.

35.     As established in the Stipulation, TD Bank has agreed to a "carve-out" (the "**Carve-Out**") from its lien on the sale proceeds in favor of Streambank's commissions and expenses, applicable taxes, if any, reasonable and customary costs of sale, the statutory commissions payable to the Trustee, the reasonable attorneys' fees and expenses incurred by the Trustee in connection with sale process, and the Break-Up Fee.

36.     As a result of the Carve-Out, the Stalking Horse Bidder has ample assurance that the Break-Up Fee will be paid to it from the proceeds of sale in the event that it is not the ultimate Successful Bidder and purchaser of the Assets.  Moreover, the Carve-Out should assure that the Estate's costs and expenses in organizing the sale and marketing the Assets will be paid.

## BASIS FOR RELIEF

**A.     The Proposed Sale**

37.     Ample authority exists for approval of the proposed sale.  Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor or the trustee.  *See Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.),* 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing asection 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. The Lionel Corp. (In re The Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983) (same).  Once a

Court is satisfied that there is a sound business justification for the proposed sale, the Court must then determine whether (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See In re Betty Owens Sch., Inc.*, No. 96 Civ. 3576 (PKL), 1997 U.S. Dist. Lexis 5877, at *11-12 (S.D.N.Y. Apr. 16, 1997); *accord In re Del. and Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Decora Indus., Inc.*, Case No. 00-4459 JJF, 2002 WL 32332749, at *3 (D. Del. May 20, 2002).

38.     As described above, an expeditious sale of the Assets is critical to the Trustee's efforts to liquidate the Assets, as the only remaining substantial assets of the Estates, and achieve the best possible distribution to creditors under the circumstances of these chapter 7 cases.

39.     The Sale Notice that the Trustee proposes to provide and the proposed Bidding and Auction Procedures are more than adequate and reasonable. As stated, the Sale Notice will be served promptly on the Sale Notice Parties. In addition, the Trustee's agent will contact various parties who have expressed an interest in acquiring the Assets to determine whether they are interested in submitting a competing bid. The Trustee believes that this is more than sufficient notice and a reasonable period in which to attract competing bids.

40.     The Trustee believes that the Purchase Price and sale terms under the Stalking Horse Bid are fair and reasonable. The Purchase Price exceeds the NYC Minimum Price of $500,000.00 – providing assurance to the Trustee that the Estate will not revert its rights to the City. Furthermore, the Purchase Price is subject to a twenty-five (25) day marketing period, which provides ample time to solicit higher and better bids, thereby "market-testing" the result.

**B.     Sale Free and Clear of Liens, Claims, Encumbrances, and Interests**

41.     In the interest of attracting the best offers, the sale of the Assets should be free and clear of any and all liens, claims, encumbrances and other interests in accordance with

section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances and other interests attaching to the sale proceeds

42.     Pursuant to section 363(f) of the Bankruptcy Code, a trustee may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if applicable nonbankruptcy law permits sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  The Trustee believes that TD Bank will consent to the Sale Transaction as contemplated by this Motion.  With respect to any other party asserting an Interest, the Trustee anticipates that she will be able to satisfy one or more of the conditions set forth in section 363(f).  If affirmative consent is not obtained from an Interest holder, this Court may nonetheless approve the sale if such party does not object.  *See Hargrave v. Pemberton (In re: Tabore, Inc.)*, 175 B.R. 855, 858 (Bankr. D. N.J. 1994) (failure to object to notice of sale or attend hearing deemed consent to sale for purposes of Bankruptcy Code section 363; *In re: Shary*, 152 B.R. 724, 725-726 (Bankr. N.D. Ohio 1993) (state's failure to object to transfer of liquor license constituted consent to sale).

## C.     Protections As a Good Faith Purchaser

43.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that

> [t]he reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp (In re Chateaugay Corp.,* No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986); *see also Allstate Ins. Co. v. Hughes,* 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) ... provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); *In re Stein & Day, Inc.,* 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.")

44.     The selection of the Successful Bidder will be the product of arm's-length, good-faith negotiations conducted in the context of a competitive bidding process. Based upon the record to be made at the Sale Hearing, the Trustee will request a finding that the Successful Bidder is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**D.    Bidding and Auction Procedures**

45.     The Trustee believes that the Bidding and Auction Procedures are fair and reasonable and will ensure that the bidding process with respect to the Auction will yield the maximum value for the Estates and creditors. Accordingly, approval of the Bidding and Auction Procedures, including the dates established thereby for the Auction and the Sale Hearing, is warranted.

**E.    The Break-Up Fee**

46.     Approval of the Break-Up Fee, as a form of bidder protection in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code has become a recognized practice

in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. The same reasoning applies in the instant chapter 7 case.

47. The Break-Up Fee and provided to the Stalking Horse Bidder and Minimum Initial Overbid are the only bid protections. The Break-Up Fee, which will be a super-priority administrative expense, and the Minimum Initial Overbid were material inducements for, and conditions of, the Stalking Horse Bidder's entry into the APA. No other form of stalking horse bidder protections are being sought. The Stalking Horse Bidder is unwilling to commit to hold open the offer to purchase the Assets under the terms of the Stalking Horse Bid unless the Stalking Horse Bidder is assured of payment of the Break-Up Fee. The Break-Up Fee will promote more competitive bidding by inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid on which other bidders and the Trustee can rely. Value has been received as a result of the Stalking Horse Bid and the Stalking Horse Bidder is entitled to be compensated as a result.

48. Ample authority exists for such a mechanism. *See, e.g., In re Finlay Enters., Inc., et al.,* Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009) (approving break-up fee); *In re Lehman Bros. Holdings Inc., et al.,* Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving break-up fee and expense reimbursement); *In re Steve & Barry's Manhattan LLC, et al.,* Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee and expense reimbursement); *In re Fortunoff Fine Jewelry and Silverware, LLC,* Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving break-up fee); *In re Bally Total Fitness of Greater New York; Inc.,* Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); *In re G+G Retail, Inc.,* Case No. 0610152

(RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); *In re Footstar, Inc.* Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004) (authorizing the debtors to enter into purchase agreements with break-up fees); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.),* 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); *In re Twinlab Corp., et al.,* Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); *In re Adelphia Bus. Solutions, Inc., et al.,* Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement).

**F.      Request for Relief Pursuant to Bankruptcy Rules 6004(h)**

49.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

50.      In light of the current circumstances, including the effort put into the auction process and the Sale Hearing, the Trustee believes that in order to preserve and maximize value, the sale of the Assets should be consummated as soon as practicable.   Moreover, the Stalking Horse APA includes an outside closing date and the Stalking Horse Bidder is not required to close absent an effective Sale Order.   Accordingly, the Trustee requests that the Sale Order approving the sale of the Assets be effective immediately upon entry of such order and that the fourteen day stay under Bankruptcy Rules 6004(h) be waived.

**G.      Waiver of Compliance with the Requirements of Local Rule 6004-1,**
**to the Extent Applicable**

51.      The Trustee proposes to conduct the sale of the Assets without employing an appraiser or an auctioneer.   The Trustee submits that given the extensive description of the procedures pursuant to which this sale will be conducted, the requirements of Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York have been satisfied.

Alternatively, to the extent that the Court finds that the Trustee has not met any applicable provision of Local Bankruptcy Rule 6004-1, she respectfully requests that the Court waive such requirements.

**H.**     <u>Notice</u>

52.     Notice of this Motion will been given in accordance with the terms of the Order Scheduling Hearing.

<u>**CONCLUSION**</u>

**WHEREFORE**, the Trustee respectfully requests that the Court grant this Motion, enter the Bidding and Auction Procedures Order, enter the Sale Order and grant the Trustee such other and further relief as may be just and proper.

Dated:    Garden City, New York
         August 17, 2011

                       **MEYER, SUOZZI, ENGLISH & KLEIN P.C.**
                       *Attorneys for Jil Mazer-Marino, Chapter 7 Trustee*


                       By:   */s/ Howard B. Kleinberg*
                              **Howard B. Kleinberg, Esq.**
                              **Jessica G. Berman, Esq.**
                       **990 Stewart Avenue, Suite 300**
                       **P.O. Box 9194**
                       **Garden City, New York 11530-9194**
                       **Phone:   (516) 741-6565**
                       **Fax:      (516) 741-6706**

839838v.2